# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEAST DIVISION

UNIVERSAL LIFE CHURCH
MONASTERY STOREHOUSE, a
Washington non-profit corporation; ERIN
PATTERSON, an individual; GABRIEL
BISER, an individual; and JAMES WELCH,
and individual,

              **Plaintiffs**,

     v.

WAYNE NABORS, in his official capacity
as County Clerk of Putnam County,
Tennessee; LISA DUKE CROWELL, in her
official capacity as County Clerk of
Rutherford County, Tennessee; WILLIAM
K. KNOWLES, in his official capacity as
County Clerk of Hamilton County,
Tennessee; ELAINE ANDERSON, in her
official capacity as County Clerk of
Williamson County, Tennessee; and
HERBERT H. SLATERY III, in his official
capacity as Attorney General of the State of
Tennessee,

              **Defendants**.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:19-cv-00049

Judge Crenshaw

Magistrate Judge Newbern

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFFS UNIVERSAL
LIFE CHURCH MONASTERY STOREHOUSE, ERIN PATTERSON, GABRIEL BISER,
AND JAMES WELCH FOR TEMPORARY RESTRAINING ORDER
TO ENJOIN ENFORCEMENT
OF TENNESSEE STATUTE 36-3-301, AS AMENDED BY
TENNESSEE 2019 PUBLIC CHAPTER 415**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................................. 1

II. BACKGROUND .............................................................................................................. 3

    A.    Plaintiff ULC Monastery. ...................................................................................... 3

    B.    Tennessee's Ordination Statute and 2019 Public Chapter 415. ............................. 6

    C.    The Impact of 2019 Public Chapter 415 ............................................................... 8

III. ARGUMENT.................................................................................................................. 10

    A.    Standards for TRO. ............................................................................................. 10

    B.    Plaintiffs Have A Strong Likelihood of Success on the Merits. ............................ 11

        1.    The Act is Subject to Strict Scrutiny Under Three Separate
               Protections of the First Amendment. ......................................................11

               a.    Establishment Clause. ................................................................. 11
               b.    Free Exercise Clause. .................................................................. 14
               c.    Free Speech Clause. .................................................................... 16

        2.    The Act Fails to Satisfy Constitutional Scrutiny. ...................................19

    C.    Plaintiffs, Other ULC Monastery Ministers, and the Public Will
        Suffer Irreparable Harm If the Court Does Not Enjoin the Act. ........................... 23

    D.    Granting Injunctive Relief Is In the Public Interest. ............................................. 24

    E.    The Balance of the Equities Favors Injunctive Relief. ......................................... 24

IV. CONCLUSION............................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Civil Liberties Union v. Reno*,
929 F. Supp. 824 (E.D. Pa. 1996) ............................................................................................17

*Baca v. Moreno Valley Unified Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) ..........................................................................................25

*Baker v. Adams Cty./Ohio Valley Sch. Bd.*,
310 F.3d 927 (6th Cir. 2002) ...........................................................................................11, 23

*Bays v. City of Fairborn*,
668 F.3d 814 (6th Cir. 2012) ...................................................................................................10

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011).................................................................................................................22

*Cantwell v. Connecticut*,
310 U.S. 296 (1940).................................................................................................................14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993).........................................................................................................15, 16

*Colo. Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ...............................................................................................13

*Congregation Lubavitch v. City of Cincinnati*,
923 F.2d 458 (6th Cir. 1991) ...........................................................................................18, 25

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) .................................................................................10, 23, 25

*Corp. of the Presiding Bishop v. Amos*,
483 U.S. 327 (1987)...........................................................................................................11, 14

*Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*,
758 F.3d 869 (7th Cir. 2014) ...........................................................................................14, 21

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ...................................................................................................10

*Elrod v. Burns*,
427 U.S. 347 (1976).................................................................................................................23

i

*Employment Division v. Smith*,
  494 U.S. 872 (1990)............................................................................................................14

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)............................................................................................................23

*Falwell v. Miller*,
  203 F. Supp. 2d 624 (W.D. Va. 2002) .................................................................................15

*Gitlow v. New York*,
  268 U.S. 652 (1925)............................................................................................................16

*Hamilton's Bogarts, Inc. v. Michigan*,
  501 F.3d 644 (6th Cir. 2007) ..............................................................................................10

*Hassan v. City of New York*,
  804 F.3d 277 (3d Cir. 2015).................................................................................................14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012).......................................................................................................18, 21

*Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*,
  2006 WL 1638537 (M.D. Tenn. June 6, 2006).....................................................................25

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) ..............................................................................................17

*Larson v. Valente*,
  456 U.S. 228 (1982).......................................................................................11, 12, 13, 14

*Lee v. Weisman*,
  505 U.S. 577 (1992)............................................................................................................11

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971)............................................................................................................14

*Miller v. City of Cincinnati*,
  622 F.3d 524 (6th Cir. 2010) ..............................................................................................23

*Miller v. Davis*,
  123 F. Supp. 3d 924 (E.D. Ky. 2015) ..................................................................................20

*N. Arapaho Tribe v. Ashe*,
  92 F. Supp. 3d 1160 (D. Wyo. 2015)...................................................................................15

*Ohio Republican Party v. Brunner*,
  543 F.3d 357 (6th Cir. 2008) ..............................................................................................10

*Packingham v. N.C.*,
137 S. Ct. 1730 (2017)...........................................................................................................17, 22

*Procter & Gamble Co. v. Bankers Trust Co.*,
78 F.3d 219 (6th Cir. 1996) ...................................................................................................10

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015)..........................................................................................16, 18, 19, 22

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*,
426 U.S. 696 (1976)..........................................................................................................14, 16

*Sherbert v. Verner*,
374 U.S. 398 (1963).................................................................................................................18

*Speiser v. Randall*,
357 U.S. 513 (1958).................................................................................................................18

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ............................................................................................19, 21

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000).................................................................................................................17

*USACO Coal Co. v. Carbomin Energy, Inc.*,
689 F.2d 94 (6th Cir. 1982) ....................................................................................................25

*Wagner v. City of Garfield Heights*,
675 F. App'x 599 (6th Cir. 2017) ...........................................................................................19

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012) ..................................................................................................15

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).................................................................................................................19

*Widmar v. Vincent*,
454 U.S. 263 (1981).................................................................................................................18

*Wilson v. N.L.R.B.*,
920 F.2d 1282 (6th Cir. 1990) ....................................................................................11, 12, 13

*Wis. v. Yoder*,
406 U.S. 205 (1972).................................................................................................................16

**State Cases**

*Aghili v. Saadatnejadi*,
958 S.W.2d 784 (Tenn. Ct. App. 1997)...................................................................................21

Case 2:19-cv-00049   Document 12   Filed 06/25/19   Page 5 of 33 PageID #: 55

**State Statutes**

Tenn. Code Ann. § 36-3-103 ...........................................................................................................6

Tenn. Code Ann. § 36-3-103(c)(1) ...................................................................................................6

Tenn. Code. Ann. § 36-3-301 ................................................................................................. *passim*

Tenn. Code Ann. § 36-3-301(a)(1) ...................................................................................................6

Tenn. Code Ann. § 36-3-301(a)(2) .................................................................................1, 2, 13, 24

Tenn. Code Ann. § 36-3-303 .........................................................................................................6, 7

Tenn. Code Ann. § 36-3-303(a) ........................................................................................................7

Tenn. Code Ann. § 36-3-304 .........................................................................................................6, 7

Tenn. Code Ann. § 39-16-504(a)(1) ................................................................................................7

Tenn. Code Ann. § 40-35-111(e)(1)–(3) ..........................................................................................7

1998 Tennessee Laws Pub. Ch. 745 ................................................................................................6

2019 Tennessee Laws Pub. Ch. 415 ...................................................................................... *passim*

**Rules**

Federal Rule of Civil Procedure 65 ...........................................................................................1, 10

**Constitutional Provisions**

U.S. Const. Amend. I............................................................................................................ *passim*

**Other Authorities**

*2019 House Floor Session*, 2019 Leg., 111th Sess. (Tenn. 2019).........................................20, 24

*Hearing on HB0213 Before the H. Comm. on the Judiciary*, 2019 Leg.,
    111th Sess. (Tenn. 2019) .................................................................................................16, 22

*Hearing on HB2079*, 1998 Leg., 100th Sess. (Tenn. 1998).............................................................6

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Universal Life Church Monastery Storehouse, Erin Patterson, Gabriel Biser, and James Welch ask this Court to immediately enjoin enforcement of Tennessee Statute 36-3-301, as amended by Laws of Tennessee 2019 Public Chapter 415, which will otherwise take effect July 1, 2019.

## I. INTRODUCTION

Beginning July 1, ministers ordained online could face liability for representing to the State that they have solemnized a marriage here, and couples who nonetheless choose to have such ministers perform their weddings will risk invalidation of their marriages. The new law, signed by Governor Lee in May, declares that "[p]ersons receiving online ordinations may not solemnize the rite of matrimony." Tenn. Code Ann. § 36-3-301(a)(2), as amended by 2019 Public Chapter 415 ("the Act"). Consequently, ministers ordained in the traditions of Plaintiff Universal Life Church Monastery Storehouse ("ULC Monastery") will no longer be able to lawfully solemnize marriages in Tennessee. Plaintiffs, the ULC Monastery and three of its Tennessee ministers, ask the Court to immediately enjoin enforcement of the Act. The Act violates their First Amendment rights to select their religion without discrimination, freely exercise their religion, and speak freely.

ULC Monastery is a non-denominational church that champions religious freedom, social justice, and spiritual expression of all kinds. One of its core tenets is that all people are naturally endowed with the rights to practice their beliefs, whatever those beliefs may be, as long as they do not infringe the rights of others and they act within the law. The Church supports charities, advocates for marriage equality, and participates in other social justice causes. Out of a desire to reach all individuals, the Church makes all of its services available through its website—including ordination of ministers. ULC Monastery is no stranger to discrimination. For years, some Tennessee clerks have turned its ministers away citing a different provision, which limits

1

the right to perform marriages to ministers designated or ordained "by a considered, deliberate, and responsible act." Tenn. Code § 36-3-301(a)(2). Under the Act, which "clarifies" the existing law, no ULC Monastery minister may lawfully perform weddings in Tennessee.

To decide whether the statute is constitutional, this Court must apply strict scrutiny. Such scrutiny is required under the Establishment Clause because the Act prefers certain religions or denominations over others on its face by extending a benefit only to those who ordain ministers in ways the legislature deems sufficient. The law is subject to strict scrutiny under the Free Exercise Clause because it singles out a specific religious practice for discrimination—ordination of ministers through the internet. Finally, the Act is subject to strict scrutiny under the Free Speech Clause because it regulates speech based on the content of that speech—its communication of ordination.

The State cannot possibly show that the statute satisfies any constitutional standard, much less strict scrutiny, which requires that a statute be narrowly tailored to serve a compelling government interest. There is no compelling interest in stopping marriages performed by ministers with online ordinations. To the contrary, the law expressly *affirms* the validity of existing marriages performed by ministers ordained online, belying any idea that such marriages are harmful. But even if the State could articulate a compelling interest, the Act is not tailored to whatever that interest may be. The Act permits a minister to solemnize a wedding if he or she is ordained by any other method, such as by fax or mail. Yet it would bar a minister who completes an online divinity school program from performing a wedding, should that school permit ordination online. The new language of 2019 Public Chapter 415 compounds the infirmities of the provision requiring a "considered, deliberate, and responsible act"—an undefined and impermissibly vague standard. Tenn. Code § 36-3-301(a)(2). The Court should enjoin and declare this language, as well as the online ordination restriction, invalid.

2

Plaintiffs have a substantial likelihood of success on the merits of their First Amendment claims. Further, in cases involving First Amendment rights, the remaining factors required to warrant a temporary or preliminary injunction are always satisfied. For these reasons, the Court should enter an order temporarily restraining enforcement of the Act, and should set a date to hear argument whether the Act should be preliminarily enjoined.

## II.    BACKGROUND

### A.    Plaintiff ULC Monastery.

ULC Monastery is a non-denominational church that champions religious freedom, social justice, and spiritual expression of all kinds. Declaration of George Freeman ¶¶ 2-3. The Church is a religious organization formed in 2006 to advance religious faith and freedom with two core tenets. *Id.* First, a person should always strive to do that which is right. *Id.* ¶ 3. Second, all people are naturally endowed with the rights to practice their beliefs, regardless of what those beliefs are, as long as they do not infringe on the rights of others and are within the law. *Id.* ULC Monastery's ministry includes support of charitable organizations, advocacy for marriage equality, and other social justice causes. *Id.* ¶ 4. The Church publishes a blog, which includes sermons written by ULC Monastery ministers, and where many commenters discuss issues of religion, spirituality, and social justice. *Id.*; Welch Decl. ¶ 4.

ULC Monastery embraces the principle that those who feel so called can become ministers. Freeman Decl. ¶ 5. To that end, ULC Monastery ordains ministers on the internet, and it sends credentials to ministers by mail. *Id.* The Church "make[s] no religious hurdles, no hoops to jump through, no tests of loyalty, no rings to kiss and no fees to pay." *Id.* (quoting ULC Monastery website). ULC Monastery expects its ministers to conduct themselves according to the Church's two core tenets, but it rejects the idea that a church's members should be made to obey the commands of any central leadership structure and embraces the equality of all

3

individuals. "In the ULC Monastery everyone is equal – the same level of greatness is enjoyed by all." *Id.* (quoting ULC Monastery website).

ULC Monastery chooses to use the internet to ordain those who feel called "based on its belief regarding what ordination is and is intended to be in the first place." *Id.* ¶ 6. Ordination is the personal calling of an individual, by God, to enter into the ministry. *Id.* Because God, and not any man or organization, directs those who choose to enter the ministry, ULC Monastery refuses to impose its own constructs or requirements on persons who feel God has called them into ministry. *Id.* To do so would conflict with the Church's most fundamental tenets. *Id.*

The Church emphasizes to its ministers that "[s]incerity is the key in ordination . . . . If you are ordained, you are expected by society to be different, to be a better person and to have a higher moral center in which others take refuge . . . ." *Id.* ¶ 7 (quoting ULC Monastery website). The Church urges ministers and prospective ministers to fulfill the services of a clergy member, warning that those who "feel that being ordained is all they need . . . are wrong – seriously wrong. Being and doing are two different sets of conditions." *Id.* (quoting website).

Many ULC Monastery ministers, including in Tennessee, choose to perform marriages. *Id.* ¶ 8. Through its website, ULC Monastery offers its ministers resources such as training and assistance in how to officiate weddings, deliver sermons, or found a church. *Id.*; *see also* Biser Decl. ¶ 4. ULC Monastery also maintains a private social network online where its ministers can connect. Freeman Decl. ¶ 8. ULC Monastery strives to fulfill the spiritual needs of as many different individuals as possible by offering a wealth of information, a variety of services, and networking opportunities. *Id.* The Church views this communion and fellowship of its many scattered ministers as just as valid a form of worship as the weekly services held in some of the world's more traditional religious institutions. *Id.*; *see also* Welch Decl. ¶¶ 3-4 (minister attesting to his spiritual growth from ULC Monastery's online community).

4

The Church relies on the internet to communicate with its ministers and intends to continue to ordain ministers online. *Id.* ¶ 9. To complete the ordination process, adherents fill out an online form including their full legal name, location, and contact information. *Id.* The page links to ULC Monastery's Terms and Conditions of Use, which highlight the importance of online communications to the Church, informing ministers that: "Frequently, the Universal Life Church Monastery will invite you to contribute to our site as part of our effort to build and maintain a global faith community by utilizing the collaborative power of the internet." *Id.*

After an applicant submits the ordination request form, the site prompts him or her to review and verify his or her information. *Id.* ¶ 10. The prompt reminds applicants that ULC Monastery will not recognize ordinations using false or incomplete information. *Id.* It also states: "After being ordained, you will be able to order minister supplies, access a full library of training literature, and perform ceremonies like weddings, funerals, and baptisms." *Id.* Once the applicant submits the final application, the applicant is brought to a page and receives an email showing a copy of the new minister's credentials. *Id.* The page states: "Welcome, [NAME], to the congregation of the Universal Life Church. As of [DATE], you are now an ordained minister." *Id.* (quoting ULC Monastery website). The page further states:

> Before performing any weddings, please click the buttons above to learn more about the ULC, receive weddings training, view a customized guide to performing marriage in your state, or generate a personalized script for the upcoming ceremony.
>
> Beyond solemnizing legal marriages, your ordination allows you to exercise a host of rights and freedoms made available to all ministers. You can start your own church, create good in your community in your new capacity, as well as perform baptisms, funerals, house-blessings, baby-namings, and a number of other ceremonies.

*Id.* (quoting ULC Monastery website).

### B. Tennessee's Ordination Statute and 2019 Public Chapter 415.

Under Tennessee law, a valid marriage requires a marriage license issued by a county clerk and signed by an individual authorized to solemnize marriages. *See* Tenn. Code Ann. § 36-3-103; Tenn. Code Ann. § 36-3-304. County clerks are "prohibited from issuing a license for a marriage that is prohibited in this state." Tenn. Code Ann. § 36-3-103(c)(1). After solemnizing the marriage, the officiant must "endorse on the license the fact and time of the marriage, and sign the license, and return it to the county clerk." Tenn. Code Ann. § 36-3-303.

Tennessee limits those authorized to solemnize marriages to certain government officials and religious figures. While the statute purports to authorize "spiritual leaders of *every* religious belief" to solemnize marriages, Tenn. Code Ann. § 36-3-301(a)(1) (emphasis added), the Tennessee legislature has twice acted to exclude disfavored religious groups. First, in 1998, the legislature added language to restrict the right to perform marriages to those whose religious "customs" provide for ordination "by a considered, deliberate, and responsible act." 1998 Tennessee Laws Pub. Ch. 745. Legislative history reveals that the bill was intended to target perceived "mail-order preachers that send off and become ordained through the laying on of 'Washingtons' or some such process."[1] And second, through its enactment of 2019 Public Chapter 415 this year, the legislature acted to prohibit ministers "receiving online ordinations" from solemnizing a marriage as of July 1, 2019, while validating all marriages before that date. The statute, as amended by 2019 Public Chapter 415, provides:

> (1) All regular ministers, preachers, pastors, priests, rabbis and other spiritual leaders of every religious belief, more than eighteen (18) years of age, having the care of souls, and all members of the county legislative bodies, county mayors, judges, chancellors, former chancellors and former judges of this state, former

---

[1] *An Act to amend Tennessee Code Annotated, Title 36, Chapter 3, relative to persons who may solemnize marriages, Hearing on HB2079*, 1998 Leg., 100th Sess., (Tenn. 1998) (statement of Sen. Roy Herron, sponsor), statement appearing at 55:25-57:00 (transcript included as Miller Decl. Ex. B; audio included as Miller Decl. Ex. C).

county executives or county mayors of this state, former members of quarterly county courts or county commissions, the governor, the speaker of the senate and former speakers of the senate, the speaker of the house of representatives and former speakers of the house of representatives . . . and the mayor of any municipality in the state may solemnize the rite of matrimony. . . .

(2) In order to solemnize the rite of matrimony, any such minister, preacher, pastor, priest, rabbi or other spiritual leader must be ordained or otherwise designated in conformity with the customs of a church, temple or other religious group or organization; and such customs must provide for such ordination or designation by a considered, deliberate, and responsible act. *Persons receiving online ordinations may not solemnize the rite of matrimony.*

(3) If a marriage has been entered into by license issued pursuant to this chapter at which any minister officiated before July 1, 2019, the marriage must not be invalid because the requirements of the preceding subdivision (a)(2) have not been met.

2019 Pub. Ch. 415 (emphasis added) (attached as Miller Decl. Ex. A).

Ministers who violate the statute face the threat of criminal liability. Tennessee law requires that a person who solemnizes a marriage endorse the marriage license and return it to the county clerk; a minister who "fails to make such return of the licenses commits a Class C misdemeanor." Tenn. Code Ann. § 36-3-303(a). The person performing the marriage also must attest that he or she "solemnize[d] the rite of matrimony between the above . . . named parties . . . ." Tenn. Code Ann. § 36-3-304. This certification may be false if the minister lacked authority to solemnize the marriage. And a person who "[k]nowingly make[s] a false entry in . . . a governmental record" commits a Class A misdemeanor. Tenn. Code Ann. § 39-16-504(a)(1). Class C misdemeanors are punishable by up to 30 days in jail and a $50 fine, and Class A misdemeanors are punishable by up to 11 months, 29 days in prison and a fine of $2,500. Tenn. Code Ann. § 40-35-111(e)(1)–(3).

The Act does not define "online ordinations." In Tennessee (and elsewhere), a variety of religious organizations may use the internet for what may be deemed "ordination"—as the Internet has facilitated the proliferation of online schools, religious or otherwise. The Act also

7

does not define the phrase "considered, deliberate, and responsible." A variety of religions appoint spiritual leaders in ways that differ from traditional Judeo-Christian methods, and may not be deemed a "considered, deliberate, and responsible act."

## C. The Impact of 2019 Public Chapter 415.

For years, ULC Monastery has received reports from its Tennessee ministers that county clerks have deemed their ordinations invalid based on the law's language regarding a "considered, deliberate, and responsible act." Freeman Decl. ¶ 12.[2] But many ministers have successfully officiated marriages in Tennessee, something 2019 Public Chapter 415 recognizes by expressly validating those marriages. With the passing of this new law, however, dozens of ULC Monastery ministers from across Tennessee have contacted the Church to express their concern regarding the ban on marriages performed by those with "online ordinations." *Id.* ¶ 13. Many ministers have expressed their desire to continue performing marriages in Tennessee. *Id.*

Among those ministers are Plaintiffs Rev. Erin Patterson, Rev. Gabriel Biser, and Rev. James Welch. *See id.* ¶¶ 15-17. ULC Monastery ordained each through its online process. *See id.*; Patterson Decl. ¶ 3; Biser Decl. ¶ 3; Welch Decl. ¶ 2. These ministers share ULC Monastery's core values. *See* Patterson Decl. ¶ 2; Biser Decl. ¶ 3; Welch Decl. ¶ 2. Each feels called to fulfill his or her role as a minister by performing wedding ceremonies, particularly for those who struggle to find compatible officiants. *See* Patterson Decl. ¶ 5 (has performed five weddings, all in Tennessee); Biser Decl. ¶ 5 (has performed four weddings, including two in Tennessee); Welch Decl. ¶ 5 (has performed two weddings, both in Tennessee).

---

[2] ULC Monastery strongly disagrees with the suggestion that its ministers do not take part in a "considered, deliberate, and responsible act" when they choose ordination through the Church. Freeman Decl. ¶ 12. To the contrary, ordination through ULC Monastery signifies a commitment among the minister, the ULC Monastery, and other adherents that the minister upholds ULC Monastery's core tenets. *Id.*

For instance, Rev. Biser ministers by providing personalized, spiritual ceremonies to couples who may distrust government and religious institutions, including same-sex couples. *See* Biser Decl. ¶ 5. Rev. Welch recently solemnized a wedding for close friends of his who grew up in different denominations, for which he provided a ceremony that accommodated the couple's views. *See* Welch Decl. ¶ 5. Similarly, Rev. Patterson seeks to fill a void by serving as an officiant for those who do not belong to a brick-and-mortar church and have trouble finding an officiant who shares their spiritual beliefs. *See* Patterson Decl. ¶ 4.

Each plaintiff minister has already been forced to cancel his or her participation in wedding ceremonies scheduled for after July 1, the effective date of 2019 Public Chapter 415. *See* Patterson Decl. ¶ 6; Biser Decl. ¶ 6; Welch Decl. ¶ 7. Rev. Welch planned to officiate a wedding on July 6, 2019, until just days ago, when the couple decided to seek alternative arrangements because of 2019 Public Chapter 415. Welch Decl. ¶ 7. He still hopes to perform the wedding if 2019 Public Chapter 415 does not take effect. *Id.* Each minister intends to perform more weddings in Tennessee. *See* Patterson Decl. ¶ 7; Biser Decl. ¶ 7; Welch Decl. ¶ 9. Rev. Patterson, for example, has suspended plans to update her Rutherford County property in ways that would allow her to host and perform weddings. Patterson Decl. ¶ 7.

The threat of enforcement of the new law has already harmed ULC Monastery and its ministers. *See* Freeman Decl. ¶ 14. The new law has caused ULC Monastery's ministers to lose faith in the validity of their ordination. *Id.* It also has affected ULC Monastery's goodwill and reputation by suggesting the Church's practices are less valid than other religions. *See id.* Once the law takes effect, it will prevent ULC Monastery's ministers from conducting one of the most universal and effective forms of outreach: solemnizing marriages. *Id.* This restriction will dramatically limit ULC Monastery's ability to spread its message in Tennessee, which harms the Church in unquantifiable ways. *Id.* It is not practical for ULC Monastery to operate physical

9

locations to accommodate all those who wish to be ordained, nor does the Church want to do so, as it would be inconsistent with its model of ministry. *Id.* The Church relies on the internet to reach and commune with these individuals. *See id.* ULC Monastery rejects the idea of a network of brick-and-mortar locations all controlled by a central leadership. *Id.* Further, it would limit the Church's reach and hinder its operation if the Church were forced to use outdated methods such as mail or fax to complete the ordination process. *Id.*

## III.    ARGUMENT

### A.    Standards for TRO.

"[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The standard for issuing a TRO is the same as for a preliminary injunction. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In both contexts, the Court should consider whether (1) the moving party has shown a strong likelihood of success on the merits; (2) the moving party will suffer irreparable harm if the injunction is not issued; (3) the injunction would cause substantial harm to others; and (4) an injunction would serve the public interest. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 685 (6th Cir. 2002).

In First Amendment cases, the first factor, likelihood of success on the merits, is determinative. *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (reversing decision declining to enjoin enforcement of festival non-solicitation policy against plaintiffs who sought to express their religious beliefs). This is because "the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute," *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (internal quotation marks omitted), and "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting

*Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (applying principle to Establishment Clause violation).

Here, Plaintiffs are likely to succeed on their claims that the Act violates the First Amendment's religious and speech guarantees. The Court must therefore find irreparable harm, which in any event is obvious. The public interest strongly favors preventing even temporary loss of First Amendment rights.

### B. Plaintiffs Have A Strong Likelihood of Success on the Merits.

#### 1. The Act is subject to strict scrutiny under three separate protections of the First Amendment.

##### a. Establishment Clause.

First, the Act is subject to strict scrutiny under the Establishment Clause, pursuant to which the State may not prefer certain religions or denominations over others.

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I; *see also Lee v. Weisman,* 505 U.S. 577, 580 (1992) (prohibition applies to states). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). When "presented with a state law granting a denominational preference, [Supreme Court] precedents demand that [courts] treat the law as suspect and that [courts] apply strict scrutiny in adjudging its constitutionality." *Id.* at 246; *see also Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987) ("[L]aws discriminating *among* religions are subject to strict scrutiny.")

"[W]hen it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions." *Wilson v. N.L.R.B.*, 920 F.2d 1282, 1286 (6th Cir. 1990) (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695

11

(1989)).  In *Larson*, for example, the Court considered a Minnesota law requiring a religious organization to register before soliciting donations if the organization receives more than half of its contributions from non-members or unaffiliated organizations. 456 U.S. at 231-32.  The Court rejected the state's argument that the law was a "facially neutral statute, the provisions of which happen to have a 'disparate impact' upon different religious organizations. On the contrary, [the law] makes explicit and deliberate distinctions between different religious organizations."  456 U.S. at 246 n.23.  The law—on its face— "distinguish[ed] between well-established churches that have achieved strong but not total financial support from their members, on the one hand, and churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members, on the other hand."  *Id.* (internal quotation marks omitted).  In *Wilson v. N.L.R.B*, the Sixth Circuit applied *Larson* to a law that exempted from union membership "[a]ny employee who is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations. . . ."  920 F.2d at 1285 (alteration in original) (quoting 29 U.S.C. § 169).  The court held the law facially discriminated among religions "because it exempts from union membership only those employees who are members of 'bona fide' religious organizations having the beliefs described in the statute."  *Id.* at 1287.

Here, the Act "makes explicit and deliberate distinctions between different religious organizations" in at least three ways.  *Larson*, 456 U.S. at 246 n.23.  First, it distinguishes between "spiritual leader[s]" ordained online and those who are not.  Consequently, the Act, much like the law in *Larson*, favors ministers of "well-established churches" with the resources for one or more physical locations and disfavors "churches which are new and lacking in a constituency" and thus more reliant on the internet.  *Id.*  Churches may choose to use the internet

12

for ordinations "as a matter of policy," *id.*, to reach a younger, global constituency, but the Act deprives ministers of such churches of the same rights afforded ministers of other churches.

Second, the Act distinguishes between religions whose ordination "customs" constitute, in the eyes of the state, a "considered, deliberate, and responsible act," and those whose customs do not rise to that ambiguous level of solemnity.[3] That is a facial preference indistinguishable from the one in *Wilson*, where the Sixth Circuit found a statute's delineation of "'bona fide' religious organizations having" particular beliefs triggered strict scrutiny. 920 F.2d at 1287; *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1256 (10th Cir. 2008) ("[T]he Colorado exclusion expressly discriminates among religions, allowing aid to 'sectarian' but not 'pervasively sectarian' institutions, and it does so on the basis of criteria that entail intrusive governmental judgments regarding matters of religious belief and practice.") (emphasis omitted) (citing *Larson*).

Finally, the Act facially distinguishes between those religions that "ordain[] or otherwise designate[]" "spiritual leaders" and those that do not because it requires that a "minister, preacher, pastor, priest, rabbi or other spiritual leader *must be ordained or otherwise designated* in conformity with the customs of a church, temple, or other religious group or organization" to solemnize a wedding. Tenn. Code. Ann. § 36-3-301(a)(2) (emphasis added). As a result, spiritual leaders selected by members of other religions or denominations differently cannot legally solemnize marriage in Tennessee.

The Act further offends the Establishment Clause because, at its core, it seeks to designate *which* ministers are sufficiently devout to perform the act of marriage. But the

---

[3] While the portion of the Act favoring religions with "customs" that provide for ordination by "considered, deliberate, and responsible act" is not new, that language compounds the problems of the "online ordination" language and is unconstitutional standing alone. As explained below, an injunction prohibiting enforcement of all of Tenn. Code. Ann. § 36-3-301(a)(2), as amended by 2019 Public Chapter 415, is necessary to prevent irreparable harm.

"government must recognize as clergy those persons designated by the faith itself." *Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 874 (7th Cir. 2014) (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)). "Because the appointment (to the chaplaincy) is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 711–12 (1976) (quoting *Gonzalez v. Archbishop*, 280 U.S. 1, 16 (1929)).[4]

### b. Free Exercise Clause.

The Act is also subject to strict scrutiny under the Free Exercise Clause, pursuant to which Congress shall make no law "prohibiting the free exercise" of religion. U.S. Const. Amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (clause applies to states). The "constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." *Larson*, 456 U.S. at 245. "Free exercise thus can be guaranteed only when legislators . . . are required to accord to their own religions the *very same treatment* given to small, new, or unpopular denomination." *Id.* (emphasis added).[5]

Under the Free Exercise Clause, the Court reviews generally applicable laws that incidentally burden religious practices using a rational basis standard, *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), but "[a] law burdening religious practice that is not neutral or

---

[4] Because the Act discriminates among religions, rather than affording a uniform benefit to all religions, the test from *Lemon v. Kurtzman* does not apply. *Corp. of the Presiding Bishop*, 483 U.S. at 339. But even if it did, the Act fails the *Lemon* standard. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) (government conduct must (1) have a secular purpose, (2) have a principal or primary effect that neither advances nor inhibits religion, and (3) not foster an excessive government entanglement with religion). The Act does not have a secular purpose, as it serves only to advance religion (at least, the legislature's favored religions).

[5] Also for the same reasons, the law violates Plaintiffs' rights under the Equal Protection Clause, which requires strict scrutiny of laws that discriminate on the basis of a fundamental right such as religion. *See Hassan v. City of New York*, 804 F.3d 277, 300 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4 (1938)).

not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. Simply put, "[a] double standard is not a neutral standard." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012). To decide the object of the law, the Court first examines its text: "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi Babalu*, 508 U.S. at 533. Even if the law is facially neutral, it is subject to strict scrutiny if it targets religious conduct for distinctive treatment. *Id.* at 534. Similarly, a law is not "general" where it selectively imposes "burdens only on conduct motivated by religious belief." *Id.* at 543.

The Act is neither neutral nor general. First, the Act "refers to a religious practice without secular meaning," *id.* at 533, because it targets "ordinations" and "designat[ions] in conformity with the customs of a church, temple or other religious group or organization." Tenn. Code. Ann. § 36-3-301. *Cf. Falwell v. Miller*, 203 F. Supp. 2d 624, 629 (W.D. Va. 2002) (provision prohibiting state assembly from granting "a charter of incorporation to any church or religious denomination" refers to a religious practice); *N. Arapaho Tribe v. Ashe*, 92 F. Supp. 3d 1160, 1179 (D. Wyo. 2015) (reference to "religious and cultural beliefs" of particular tribe was not neutral). Second, the Act not only targets religious practice, it targets Plaintiffs' religious practice. The Act's sponsor stated that the bill is intended to prohibit "when somebody goes online and receives it online and pays $50 and don't do any training whatsoever and gets a certificate[;] that's what we are trying to stop with the courts."[6] In addition to being profoundly

---

[6] *An Act to amend Tennessee Code Annotated, Section 36-3-301, relative to persons who may solemnize marriages: March 20, 2019 Hearing on HB0213 Before the H. Comm. on the Judiciary*, 2019 Leg., 111th Sess., (Tenn. 2019) (statement of Rep. Ron Travis, sponsor), video

inaccurate,[7] the sponsor's statement effectively admits the Act was motivated by hostility toward ULC Monastery for its practice of ordaining ministers through the internet.

Since the Act is neither neutral nor general, the Court must apply strict scrutiny. *Lukumi Babalu*, 508 U.S. at 532; *see also Wis. v. Yoder*, 406 U.S. 205, 215 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

**c.      Free Speech Clause.**

Finally, the Act is subject to strict scrutiny under the Free Speech Clause of the First Amendment, which prohibits states from enacting any law "abridging the freedom of speech." U.S. Const. Amend. I; *see also Gitlow v. New York*, 268 U.S. 652 (1925) (Fourteenth Amendment applies free speech guarantees to states). "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015). Content-based speech restrictions are "presumptively unconstitutional," and the government must "prove[] [it is] narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).

The Act's singling-out of "online ordination" as a type of speech subject to special disfavor mandates stringent review for at least three reasons. First, the Act expressly targets

---

available at: http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=16847, statement appearing at 45:09-45:21 (video included as Miller Decl. Ex. D).

[7] ULC offers ordination online *for free* and, while the Church does not require adherents to undergo specific training, it offers its ministers many educational resources. Freeman Decl. ¶¶ 5-8. The absence of a training requirement is a feature—not a bug. The idea that those individuals called to ministry are entitled to ordination—whether formally trained or not—is one way ULC Monastery exercises and furthers its religious values. *See id.* ¶¶ 5-6. The sponsor may not like ULC's chosen methods of ministry, but he has no right to question the Church's selection of ministers. *See Serbian E. Orthodox Diocese* 426 U.S. at 711–12.

*online* ordinations—those ordinations occurring on the internet. Expression on the Internet—a medium where "we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be," *Packingham v. N.C.*, 137 S. Ct. 1730, 1736 (2017) —and which "deserves the highest protection from governmental intrusion." *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 883 (E.D. Pa. 1996), *aff'd,* 521 U.S. 844 (1997). As the Supreme Court recently observed, "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet.'" 137 S. Ct. at 1736 (quoting *Reno*, 521 U.S. at 868). The internet offers "relatively unlimited, low cost capacity for communication of all kinds," and "[t]he Internet's forces and directions are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow." *Id.* at 1732. As a result, "the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to the vast networks in that medium." *Id.*; *see* Freeman Decl. ¶¶ 9, 14 (describing ULC Monastery's use of internet).

Second, the Act singles out quintessentially religious expression—ordination itself—for regulation. *Cf. Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012) ("We have no difficulty concluding that wedding ceremonies are protected expression under the First Amendment."). "Discrimination against religious speech as such is content-based, and unconstitutional unless the [government] meets the standards appropriate to such a restriction." *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991) (citing *Widmar v. Vincent,* 454 U.S. 263, 269-70 (1981)). In *Widmar*, the Supreme Court rejected the idea that religious "speech acts" warrant less First Amendment protection than other forms of speech or expression. All forms of "speech about religion" are protected, and any attempt to investigate "the significance of words and practices to different religious faiths, and in varying

17

circumstances by the same faith," would impermissibly entangle the state and the courts with religion "in a manner forbidden by our cases." 454 U.S. at 269 n.6.[8] Here, the Act targets religious expression and association: it disfavors only "online *ordination*," not any other speech online, and therefore "[d]iscriminat[es] against religious speech" and "is content-based." *Congregation Lubavitch*, 923 F.2d at 460; *see also Hosanna-Tabor*, 565 U.S. at 200-01 ("Religious groups are the archetype of associations formed for expressive purposes . . . .").

Third, the Act's regulation of "online ordination" is content-based because it "applies to particular speech *because of the topic discussed or the idea or message expressed.*" *Reed*, 135 S. Ct. at 2227 (emphasis added). A court reviewing a challenged law must consider whether the law draws distinctions "based on the message a speaker conveys," *either* through "defining regulated speech by particular subject matter," *or* more subtly "defining regulated speech by its function or purpose." *Id.* "Both distinctions are drawn based on the message a speaker conveys [and, therefore] are subject to strict scrutiny." *Id.* at 2222. The proper test under *Reed* is "whether a law [i]s content-based at all, rather than the type of content the law target[s]." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). Here, the Act burdens only "online ordinations," a "particular subject matter" under *Reed*. That is a quintessential content-based restriction. *Cf. Wagner v. City of Garfield Heights*, 675 F. App'x 599, 607 (6th Cir. 2017) (applying strict scrutiny to regulation of political signs; regulation "applies to particular speech because of the topic discussed") (internal quotation marks omitted). But even if the Act were not

_____

[8] The government may argue it does not *prohibit* online ordination, it merely strips the privilege of solemnization from those ministers ordained online. Under the First Amendment, that is a distinction without a difference. *E.g. Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("To deny [a benefit] to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech."); *Sherbert v. Verner,* 374 U.S. 398 (1963) ("Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine .... It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

18

so obviously content-based, it would still trigger *Reed's* "more subtle" inquiry by "defining regulated speech by its function or purpose."  Again, the *only* regulated speech is that which accomplishes "online ordination," a specific "function or purpose" targeted by the Act.  Under any analytical framework, the Act is content-based, triggering strict scrutiny.[9]

## 2. The Act Fails to Satisfy Constitutional Scrutiny.

Strict scrutiny applies to the Act because: (1) it prefers certain religions over others in violation of the Establishment Clause; (2) it is not neutral and generally applicable for purposes of the Free Exercise Clause; and (3) it is a content-based restriction on speech.  The Act cannot survive strict scrutiny, and it fails even under a lesser standard because it is arbitrary and discriminatory.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (content-neutral restriction on the time, place, or manner of speech must still be "narrowly tailored to serve a significant government interest").

First, the Act furthers no compelling interest or even a legitimate interest.  Restricting marriage solemnization by individuals the state deems unworthy is not compelling.  *Cf. Miller v. Davis*, 123 F. Supp. 3d 924, 937 (E.D. Ky. 2015) (clerk's proffered interest in advancing religious freedom by denying marriage licenses not compelling).  To the extent the State suggests its overt discrimination is necessary to protect the institution of marriage, 2019 Public Chapter 415 itself defeats this argument.  The Act implicitly admits that marriages performed by ministers with "online ordinations" pose no significant social ill because the Act *affirmatively ratifies* all such marriages from before July 1, 2019.  2019 Public Chapter 415, Section 4 ("If a

---

[9] The government cannot rely on its even-handed application of the Act to all *viewpoints*, i.e., punishing online ordination regardless of the denomination.  *See Reed*, 135 S. Ct. at 2230 ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints in that subject matter."); *see also Susan B. Anthony List*, 814 F.3d at 473 ("The *Reed* Court held that strict scrutiny is the appropriate level of review when a law governs any specific subject matter ... even if it does not discriminate among viewpoints within that subject matter." (internal quotation marks omitted)).

marriage has been entered into by a license issued pursuant to this chapter at which any minister officiated before July 1, 2019, the marriage must not be invalid because the requirements of the preceding subdivision (a)(2) [concerning online ordinations] have not been met.").

Second, the law bears no relationship to the legislature's stated interest. Legislators enacted the law to provide "clarity" because "we don't want to have folks think that they are involved in a legal marriage and then find out later . . . they got a legal problem on their hands."[10] If the goal were to protect couples from surprise, the legislature could have simply validated marriages performed by ministers of *all* religions prospectively, as it did retroactively. Instead, it achieved the opposite result. Many citizens—couples and ministers—may not learn of 2019 Public Chapter 415. And county clerks may continue to issue marriage licenses to couples without knowing the nature of the officiant's ordination. *See* Rutherford County, County Clerk, available at http://rutherfordcountytn.gov/countyclerk/ ("[C]ounty clerks are not responsible for investigating whether an officiant has legal authority to perform the solemnization of a marriage."). As a result, the new law does nothing to prevent couples from entering marriages performed by ministers with online ordinations only later to find out the marriage was invalid, and the legislature has created the very problem it purportedly acted to correct.

The Act is also profoundly overbroad. *See Susan B. Anthony List*, 814 F.3d at 475 (overinclusive and underinclusive laws fail strict scrutiny's narrow tailoring prong). Its requirement that individuals qualified to solemnize a marriage be ordained or designated "by a considered, deliberate, and responsible act," sweeps so broadly it would prohibit Islamic imams from solemnizing marriage, since "Islamic law stipulates quite precisely that anyone with the

---

[10] *An Act to amend Tennessee Code Annotated, Section 36-3-301, relative to persons who may solemnize marriages: April 4, 2019 House Floor Session*, 2019 Leg., 111th Sess., (Tenn. 2019) (statement of Rep. Michael G. Curcio), video available at:
http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17075, statement appearing at 1:45:19-1:47:16 (video included as Miller Decl. Ex. E)

20

requisite knowledge of Islamic law is competent to perform religious ceremonies, including marriage. One is not required to have an official position in a religious institution such as a mosque (masjid) in order to be qualified to perform such ceremonies." *Aghili v. Saadatnejadi,* 958 S.W.2d 784, 788 (Tenn. Ct. App. 1997) (citing and adopting expert testimony); *see also Hosanna-Tabor,* 565 U.S. at 202 n.3 ("In Islam, for example, 'every Muslim can perform the religious rites, so there is no class or profession of ordained clergy.'") (quoting 10 Encyclopedia of Religion 6858 (2d ed. 2005)) (Alito, J., concurring). Similarly, as the Seventh Circuit noted in striking down Indiana's marriage solemnization law, Buddhists also "lack members of the clergy," *i.e.* are not ordained. *Ctr. for Inquiry, Inc.,* 758 F.3d at 874. In its zeal to punish adherents recognizing online ordination, the government may have effectively outlawed marriages conducted in the Muslim and Buddhist faiths (among others)—a result so patently overbroad it cannot support any articulated governmental interest.

Even the Act's narrower prohibition on "online ordinations" sweeps too broadly to narrowly advance any discernable government interest. The Act does not define "online ordinations." It prohibits solemnization of marriage by *anyone* ordained "online," i.e., anyone "invest[ed]…officially (as by the laying on of hands) with ministerial or priestly authority" by something "connected to, served by, or available through a system and especially a computer or telecommunications system (such as the internet)."[11] In this, the age of the internet, where the Supreme Court has recognized its use as a forum for religious discussion, *Packingham*, 137 S. Ct. at 1736, and where online schools have proliferated, the government has swept up *all* ordinations occurring "online," not just those from ULC Monastery or churches the state considers unworthy. If graduates of religious (or other) schools attend an ordination ceremony

---

[11] Merriam-Webster, *Ordained*, available at https://www.merriam-webster.com/dictionary/ordained (Miller Decl. Ex. H); Merriam-Webster, *Online*, available at https://www.merriam-webster.com/dictionary/online (Miller Decl. Ex. I)

over a computer network—for example, over video while the putative minister is working in a remote village on a mission—that minister is not allowed to solemnize marriage in Tennessee.[12]

Moreover, the Act is underinclusive, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 135 S. Ct. at 2232 (internal quotation marks omitted). Assuming the Act seeks to regulate ordinations the State feels lack the necessary solemnity—and even assuming that is a compelling interest—the Act only bans "online" ordinations, leaving open ordination by mail, telephone, or countless other methods. This is not speculation; by way of example, an entity called "HLAM Ministries" is advertising that, to address 2019 Pubic Chapter 415, it will "outsource[] ALL ordinations to local denominational churches that are NOT online" with only a "$100 administration fee." HLAM Ministries, available at https://www.hlam.net/ordination (Miller Decl. Ex. F). Since the Act leaves open myriad avenues to conduct ordinations indistinguishable from or far more suspect than any online ordination, the Act not only fails strict scrutiny, it is arbitrary and fails under any standard.

The Act's overbreadth and underinclusiveness are compounded by its vagueness. *See Reno*, 521 U.S. at 871-72 (vagueness raises "special First Amendment concerns" when it has an "obvious chilling effect on free speech" and threatens criminal penalties and discriminatory enforcement). "[R]egulated parties should know what is required of them so they may act

_____

[12] When asked if the online ordinations ban would impact "accredited institutions," the bill's sponsor responded, "I do not think so," but provided no explanation why. *An Act to amend Tennessee Code Annotated, Section 36-3-301, relative to persons who may solemnize marriages: March 20, 2019 Hearing on HB0213 Before the H. Comm. on the Judiciary*, 2019 Leg., 111th Sess., (Tenn. 2019) (statement of Rep. Ron Travis, sponsor), video available at: http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=16847, statement appearing at 45:09-45:21 (video included as Miller Decl. Ex. D).

22

accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Even if ULC

Monastery abandoned online ordinations, it would be impossible to know what the State

considers sufficiently "considered, deliberate, and responsible." "Without clear standards

guiding the discretion of public officials with enforcement authority, there is a risk that those

officials will administer the policy based on impermissible factors." *Miller v. City of Cincinnati*,

622 F.3d 524, 539 (6th Cir. 2010) (internal quotation marks omitted).

### C. Plaintiffs, Other ULC Monastery Ministers, and the Public Will Suffer Irreparable Harm If the Court Does Not Enjoin the Act.

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see

also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (irreparable injury

presumed from loss of First Amendment rights); *see also also Baker v. Adams Cty./Ohio Valley

Sch. Bd*., 310 F.3d 927, 930 (6th Cir. 2002) (Establishment Clause violation causes irreparable

harm). Here, the Act violates the First Amendment's guarantees of freedom of speech, as well as

the Establishment Clause and the Free Exercise Clause—all injuries to Plaintiffs' First

Amendment rights. The Act punishes ULC Monastery's mode of communicating ordination,

favors certain religions over ULC Monastery by granting them rights withheld from ULC

Monastery's ministers, and infringes ULC Monastery adherents' right to freely exercise their

religion by ordaining according to the practices and customs of the Church.

To prevent irreparable harm to ULC Monastery and its ministers, the Court should enjoin

enforcement of all of Tenn. Code Ann. § 36-3-301(a)(2), as amended by 2019 Public Chapter

415, and not just the newly added "online ordinations" language. While the language regarding

"considered, deliberate, and responsible" acts is not new, it is unconstitutional standing alone

because it expressly prefers religions with the legislature's approved "customs." Although UCL

23

Monastery has always viewed its ordination as involving a "considered, deliberate, and responsible" act, the legislature's addition of the online ordination language to "clarify" the statute shows that it disagrees.[13]  Further, ministers have reported that various county clerks have relied on the existing language to exclude them performing marriages, and given the legislature's recent expression of antagonism toward ULC Monastery and its ministers, Plaintiffs fear the existing language will be increasingly used against them even if the Court enjoins the "online ordination" language.  As a result, an injunction limited to enjoining the ban on "online ordinations" would be insufficient to prevent irreparable harm.

### D.   Granting Injunctive Relief Is In the Public Interest.

"[T]he public interest lies in a correct application" of the First Amendment. *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991); *see also Connection Distrib. Co.*, 154 F.3d at 288 ("[W]here the public interest lies . . . is dependent on the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted).  Again, the Act would burden protected speech, establish religious preferences, and infringe Plaintiffs' religious freedom rights, so an injunction serves the public interest.

### E.   The Balance of the Equities Favors Injunctive Relief.

Finally, the balance of equities favors granting injunctive relief.  If the Act takes effect, ULC Monastery adherents will be unable to solemnize marriages under Tennessee law, and any couples married by ULC Monastery ministers will have the validity of their marriage cast into

---

[13] *An Act to amend Tennessee Code Annotated, Section 36-3-301, relative to persons who may solemnize marriages: April 4, 2019 House Floor Session*, 2019 Leg., 111th Sess., (Tenn. 2019) (statement of Rep. Michael G. Curcio), video available at:
http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17075, statement appearing at 1:45:19-1:47:16 (video included as Miller Decl. Ex. E) ("[W]e would clarify that moving forward those online ordinations would no longer be valid because that is something that we want to make sure we do not do . . . .").

doubt. More fundamentally, all ULC Monastery adherents will live with the stain of knowing the State officially disapproves of their religious practices. On the other hand, delaying enforcement of the Act will not harm the State, as the State has no interest in enforcing an unconstitutional law. *See Connection Distrib. Co.*, 154 F.3d at 288.[14]

## IV.   CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a temporary restraining order and set a date to hear argument on whether the Act should be preliminarily enjoined.

[SIGNATURE ON FOLLOWING PAGE]

---

[14] The Court should enter an injunction without requiring a bond. "[T]he amount of security given by an applicant for an injunction is a matter for the discretion of the trial court, which may in the exercise of that discretion even require no security at all." *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982). Courts regularly do not require bonds for injunctions based on constitutional challenges. *See, e.g.*, *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996). Courts in this circuit have required no bond to secure an injunction that would "cause no discernible monetary damage to the defendants." *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 2006 WL 1638537, at *22 (M.D. Tenn. June 6, 2006).

Respectfully submitted,

**ADAMS AND REESE LLP**

By:  */s/ Rocklan W. King III*

**Rocklan W. King III** (BPR No 030643)
424 Church Street, Suite 2700
Nashville, TN 37219
Phone: (615) 259-1450
Fax: (615) 259-1470
rocky.king@arlaw.com

**Lucian T. Pera** (BPR No. 11641)
Crescent Center
6075 Poplar Avenue, Suite 700
Memphis, TN 38119
Phone: (901) 524-5278
Fax: (901) 524-5378
lucian.pera@arlaw.com

**DAVIS WRIGHT TREMAINE LLP**

**Bruce E.H. Johnson** (*pro hac vice pending*)
(WSBA No. 7667)
**Ambika K. Doran** (*pro hac vice pending*)
(WSBA No. 38237)
**Robert E. Miller** (*pro hac vice pending*)
(WSBA No. 46507)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Phone: (206) 622-3150
Fax: (206) 757-7700
brucejohnson@dwt.com
ambikadoran@dwt.com
robertmiller@dwt.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 24th day of June, 2019, the foregoing was

electronically filed utilizing the CM/ECF system. Notice of this filing will be sent by operation

of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All

other parties will be served, on June 25, 2019, by U.S. Mail, postage prepaid, or process server.

Parties may access this filing through the Court's electronic filing system.

Wayne Nabors
County Clerk of Putnam County, Tennessee
121 South Dixie Avenue
Cookeville, TN 38501

Lisa Duke Crowell
County Clerk of Rutherford County, Tennessee
319 North Maple Street, Suite 121
Murfreesboro, TN 37130

William K. Knowles
County Clerk of Hamilton County, Tennessee
6135 Heritage Park Drive
Chattanooga, TN 37416

Elaine Anderson
County Clerk of Williamson County, Tennessee
1320 West Main Street, Suite 135
Franklin, TN 37064

Herbert H. Slatery III
Attorney General of the State of Tennessee
301 6th Avenue North
Nashville, TN 37243

*/s/ Rocklan W. King III*
Rocklan W. King III