# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF
## TENNESSEE AT NASHVILLE

|  |  |  |  |
|---|---|---|---|
| **UNIVERSAL LIFE CHURCH, et al.,** | ) | | |
| | ) | | |
| **Plaintiffs,** | ) | | |
| | ) | | |
| **v.** | ) | **No. 2:19-cv-00049** | |
| | ) | **CHIEF JUDGE CRENSHAW** | |
| **WAYNE NABORS, et al.,** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |

---

## STATE OF TENNESSEE RESPONSE IN
## OPPOSITION TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER

---

Plaintiffs are the Universal Life Church Monastery Storehouse (ULC), a non-denominational religious organization and a Washington non-profit organization, and four ordained ULC ministers who reside in Tennessee. They ask this Court to enjoin enforcement of Tenn. Code Ann. § 36-3-301 and Chapter 415 of the Tennessee Public Laws of 2019, which amends § 36-3-301 effective July 1, 2019. That request should be denied. There is no likelihood, let alone the requisite strong possibility, that Plaintiffs will prevail in their action for declaratory and injunctive relief. Moreover, plaintiffs cannot demonstrate that they will suffer irreparable injury absent a stay or that the public interest will be served by enjoining the application of Chapter 415 or § 36-3-301.

Chapter 415 does not alter the authority of ULC ministers to solemnize marriages in Tennessee. The applicable requirements of § 36-3-301 have not changed in twenty years; nor has the State's publicly available interpretation that ULC's ordination of its ministers does not satisfy those requirements. The extraordinary remedy of a temporary restraining order is thus not warranted.

## BACKGROUND AND PROCEDURAL HISTORY

Tennessee has abrogated the common law and established by statute the exclusive procedures for marriage in the State. *See Smith v. N. Memphis Sav. Bank*, 115 Tenn. 12, 89 S.W.392 (1905). One of these statutory requirements, dating to 1778, governs who may solemnize marriages in the State. *See Bashaw v. State*, 9 Tenn. (1 Yer.) 177, 184 (1829). Interpreting this provision—Tenn. Code Ann. § 36-3-301 (1997)—the Tennessee Attorney General concluded in 1997 that ULC ministers were not authorized to solemnize marriages in Tennessee. *See* Exhibit A, Tenn. Att'y Gen. Op. U97-041 (Sept. 2, 1997). At that time, § 36-3-301 authorized to solemnize marriages "all regular ministers of the gospel of every denomination and Jewish rabbis, more than eighteen (18) years of age, having the care of souls." Tenn. Code Ann. § 36-3-301(a) (1997).

After analyzing Tennessee's statute and case law from other States examining the authority of ULC ministers to perform marriages, the Attorney General concluded that "a minister authorized to solemnize marriage must be ordained in conformity with the customs of a denomination and authorized to perform religious functions of that denomination" and that "[s]uch ordination should be a considered, deliberate and responsible act." Exhibit A, Tenn. Att'y Gen. Op. U97-041, at 6. Because the Attorney General found "no indication that the legislature intended that a person who obtains a certificate of ordination solely by sending in a mail application and paying a fee . . . would be qualified to solemnize marriage," he concluded that ordination by ULC pursuant to those acts "did not confer the status of minister for purposes of solemnizing marriage." *Id.* In a follow-up opinion, the Tennessee Attorney General concluded that county clerks did not have the authority to examine the qualifications of a person seeking to solemnize a marriage but had only the ministerial duty to record marriage licenses. Exhibit B, Tenn. Att'y Gen. Op. 97-139 (Oct. 9, 1997).

The Tennessee General Assembly subsequently clarified that the Attorney General had been correct that ordination must occur pursuant to a considered, deliberate, and responsible act.

1998 Tenn. Pub. Acts, ch. 745 § 2.  The 1998 Act added a new subsection that remains unchanged in relevant part:

> In order to solemnize the rite of matrimony, any such minister, preacher, pastor, priest, rabbi or other spiritual leader must be ordained or otherwise designated in conformity with the customs of a church, temple or other religious group or organization; and such customs must provide for such ordination or designation by a considered, deliberate, and responsible act.

Tenn. Code Ann. § 36-3-301(a)(2).

In response to a request from state senator Todd Gardenhire, the Attorney General revisited the issue in 2015 in light of this amendment and reaffirmed its 1997 conclusion that ULC ministers are not authorized to solemnize marriages under § 36-3-301.  Exhibit C, Tenn. Att'y Gen. Op. 15-14 (Feb. 6, 2015).  The Attorney General reasoned that "[t]he process of becoming an ordained minister of the Universal Life Church has not materially changed since the issuance" of the 1997 opinion because "[a]ll that is necessary to become ordained is that the applicant provide a 'valid legal' name, an e-mail address, a country, and a state, and confirm that he or she is 'over the age of 13.'"  *Id.* at 1. The opinion concluded that ordination "is not in any way related to the statutory requirement that the person ordained by a spiritual leader" and "other than the click of a mouse, no 'considered, deliberate, and responsible act' as required by [§ 36-3-301] is a prerequisite for ordination by the Universal Life Church."  *Id.* at 2.  ULC noted the 2015 opinion on its website on June 26, 2015, *see* Exhibit D, ULC Blog Post (June 26, 2015), and, as a result of that opinion, has advised on its website that ULC ordination is "[n]ot [g]enerally" recognized in Tennessee and that the spiritual leaders authorized by § 36-3-301 to solemnize marriage do not "include ministers of [ULC]," Exhibit E, ULC Website on Tennessee Marriage Laws (June 24, 2019).

Chapter 415 of the Tennessee Public Acts of 2019 amends § 36-3-301 in a number of ways. Relevant here, it adds to the end of subdivision (a)(2) the following qualification, effective July 1, 2019: "Persons receiving online ordinations may not solemnize the rite of matrimony."  2019 Tenn.

3

Pub. Acts, ch. 415, § 3. It also amends subdivision (a)(3) to provide that marriages entered into before July 1, 2019 are not "invalid because the requirements of the preceding subdivision (a)(2) have not been met." 2019 Tenn. Pub. Acts, ch. 415 § 4.

Plaintiffs instituted this action on June 21, 2019, seeking a declaration that § 36-3-301, as amended by Chapter 415, is unconstitutional under the U.S. and Tennessee Constitutions, a temporary restraining order, later to be made a permanent injunction, prohibiting the enforcement of § 36-3-301, as amended by Chapter 415, and a judgment awarding ULC its costs and attorneys' fees. Complaint, ECF No. 1, at 18. Plaintiffs named as defendants the county clerks of Putnam, Rutherford, Hamilton, and Williamson Counties in their official capacities and the Attorney General of Tennessee in his official capacity. *Id.* at ¶¶ 8-12.

On June 25, 2019, Plaintiffs filed emergency motions for a temporary restraining order and an expedited hearing on the motion. Plaintiffs' TRO Motion, ECF No. 11, at 1. Plaintiffs moved this Court "for an Order temporarily enjoining defendants and all persons in active concert or participation with them from enforcing a new law, Tennessee Code § 36-3-301(2), as amended by Tennessee Public Chapter 415 . . . which will otherwise take effect July 1, 2019." *Id.* at 1-2. In the memorandum of law in support of their TRO motion, the Plaintiffs contended that "[b]eginning July 1, ministers ordained online could face liability for representing to the State that they have solemnized a marriage here, and couples who nonetheless choose to have such ministers perform their weddings will risk invalidation of their marriages." Plaintiffs' Mem. in Support of TRO Motion, ECF No. 12, at 1 ("TRO Mem."). As a consequence of Chapter 415, in Plaintiffs' view, "ministers ordained in the traditions of [ULC] will no longer be able to lawfully solemnize marriages in Tennessee." *Id.* They allege that Chapter 415 "violates their First Amendment rights to select their religion without discrimination, freely exercise their religion, and speak freely." *Id.* Accordingly, they ask this Court to immediately enjoin enforcement of Chapter 415. *Id.*

4

The Court granted Plaintiffs' motion for an expedited hearing on their motion for a temporary restraining order and set a hearing for Wednesday, July 3, 2019. June 25 Order, ECF No. 18. The court also ordered the defendants to respond by noon on July 1, 2019. *Id.*

## LEGAL STANDARD

Rule 65(b) of the Federal Rules of Civil Procedure permits a party to seek a temporary restraining order to prevent immediate and irreparable injury. A temporary restraining order is an "extraordinary remedy" whose purpose is to preserve the status quo. *Shelby Cty. Advocates for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 768 (W.D. Tenn. 2018) (internal quotation marks omitted).

In considering whether a temporary restraining order is warranted, this Court must consider (1) whether the Plaintiffs have demonstrated a strong likelihood of success on the merits; (2) whether they will suffer irreparable injury in the absence of equitable relief; (3) whether the requested relief will cause substantial harm to others; and (4) whether the public interest is best served by the requested relief. *See Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connecticut Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## REASONS FOR DENYING INJUNCTIVE RELIEF

### A. ULC and its Ministers Cannot Show a Strong Likelihood of Success on the Merits of their First Amendment Claims.

Plaintiffs claim they are likely to succeed on claims arising under three provisions of the First Amendment—the Establishment, Free Exercise, and Free Speech Clauses. Their argument that these claims have a strong likelihood of success depends wholly on plaintiffs' contention that Chapter 415 and § 36-3-301 are subject to strict scrutiny under the precedent governing these clauses. That is

5

incorrect. Chapter 415 and § 36-3-301 are neutrally applicable laws that do not infringe or restrict expressive activity and are subject only to rational basis scrutiny, a scrutiny they easily satisfy. Moreover, plaintiffs cannot show a strong likelihood of success on the merits because their claims are not justiciable and otherwise barred by the applicable statute of limitations.

### 1. Plaintiffs lack standing to challenge either § 36-3-301 or Chapter 415.

The "'threshold question in every federal case is whether the court has judicial power to entertain the suit.'" *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 709 (6th Cir. 2015) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). Article III of the U.S. Constitution limits the jurisdiction of federal courts to cases and controversies, and a "series of 'justiciability doctrines'" enforce that limitation. *Id.* "Perhaps the most important" of these doctrines is standing, which requires the plaintiff to demonstrate "(1) that he has suffered an 'injury in fact,' (2) that there is 'a causal connection between the injury and the conduct complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

When a plaintiff brings suit under the Declaratory Injunction Act, 28 U.S.C. § 2201—as Plaintiffs have here, *see* Complaint ¶ 1—they are not excused from the requirements of Article III. *See Fieger v. Michigan Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009). A court lacks jurisdiction over a declaratory judgment action if "the claimant lacks standing, that is 'a sufficiently concrete and redressable interest in the dispute.'" *Id.* (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008)). A plaintiff does not have to subject herself to liability before challenging a statute under the Declaratory Judgment Act, but must demonstrate "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible

6

threat of prosecution thereunder.'" *Kiser*, 765 F.3d at 608 (quoting *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Plaintiffs cannot meet their burden to establish Article III standing to challenge the constitutionality of § 36-3-301 or Chapter 415 because (1) they have no legally cognizable injury from either provision, (2) their requested relief with respect to Chapter 415 would not redress their alleged injuries, and (3) there is no credible threat of prosecution sufficient to create a concrete dispute under the Declaratory Judgment Act.

First, plaintiffs cannot demonstrate a legally cognizable injury that results from § 36-3-301 or Chapter 415. They assert a desire and intention to perform marriage ceremonies and to communicate freely within ULC and with other ministers. Even assuming the validity of the Plaintiffs' constitutional interpretation, Chapter 415 does not inhibit or infringe on either of those desires. ULC ministers may still perform marriages and engage in any religious ceremony of their choosing. The couple would simply need to then have their marriage solemnized in the State by a clerk. And the church may ordain whomever it chooses as ministers and communicate freely with those ministers and others online in the course of the ordination process or otherwise.

Section 36-3-301, as amended by Chapter 415, governs only which individuals the State has decided to authorize to solemnize marriages. There is no recognized constitutional right to *perform* a marriage, let alone a constitutional right to have the authority under state law to solemnize a marriage. *See Jones v. Bradley*, 590 F.2d 294, 296 (9th Cir. 1979) (finding "no support for th[e] proposition" that "a pastor of the ULC" has "a First Amendment free exercise right to perform marriages"); *Rubino v. City of New York*, 480 N.Y.S.2d 971, 937 (Sup. Ct. N.Y.C. 1984) (concluding that a ULC minister had "no recognized First Amendment free exercise right to perform marriage"). Plaintiffs thus suffer no cognizable injury from the fact that ULC ministers may lack authority to solemnize marriages in Tennessee.

7

Chapter 415 establishes only that spiritual leaders ordained online do not have the authority to solemnize a marriage. Plaintiffs themselves suffer no direct injury from that provision. And plaintiffs have no standing to raise the rights of third parties, namely individuals wishing to have their marriage not just performed but also solemnized by ULC ministers. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("We have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Plaintiffs have neither alleged they have a sufficiently "close" relationship with any such couples to justify third-party standing nor demonstrated that "there is a 'hindrance'" to those couples "ability to protect [their] own interests." *Id.* (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Second, Plaintiffs cannot show that enjoining Chapter 415 would redress their alleged injuries. *See Rasins Landscape & Assocs. v. Mich. Dep't of Transp.*, 528 Fed. App'x 441, 445 (6th Cir. 2013) ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quoting *Lujan*, 504 U.S. at 561)). As Plaintiffs acknowledge, existing law authorizes to solemnize marriages only minsters and other spiritual leaders who have been ordained or designated pursuant to a "considered, deliberate, and responsible act." The Attorney General opined in 1997 that ULC ministers who were ordained by mail in a cursory manner did not meet that requirement and did not have the "care of souls"; neither the statute nor ULC's practices have changed materially since that opinion. The Attorney General reaffirmed that conclusion in 2015 after analyzing ULC's current online ordination procedure. Enjoining Chapter 415 would not alter the status of ULC ministers under Tennessee law. The requested relief would thus not redress Plaintiffs' alleged injuries. They would remain unauthorized to solemnize marriages by existing law. *See* Exhibit F , Tenn. Att'y Gen. Op. 19-08 (June 20, 2019).

8

Third, Plaintiffs cannot meet their burden to show there is a "credible threat" of prosecution or enforcement sufficient to create an Article III case or controversy in this declaratory judgment action. Plaintiffs contend that "[m]inisters who violate [Chapter 415] face the threat of criminal liability." TRO Mem. 7. But the provisions they cite do not support such a contention. Section 36-3-303(a), the first statute on which Plaintiffs rely, requires "[o]ne authorized by § 36-3-301 who solemnizes the right of matrimony" to record the marriage on the license, sign it, and return it to the county clerk within three days of the marriage." Tenn. Code Ann. § 36-3-303(a). If the person "fails to make such a return of the license," he is guilty of a Class C misdemeanor. The prohibition applies only to "[o]ne authorized by § 36-3-301," however, and would thus not be applicable to—and present no threat of prosecution to—individuals not authorized, such as ULC ministers. And, more importantly, the criminal prohibition has nothing to do with solemnization; it addresses only the failure to return a license to the clerk within the specified time frame. For both of those reasons, § 36-3-303 does not establish even the possibility, let alone a "credible threat," of prosecution for signing a license despite not being authorized to do so by § 36-3-301.

Tennessee Code Ann. § 36-3-304 similarly fails to establish the requisite credible threat of prosecution to satisfy Article III's standing requirements. The statute requires the clerk to include, on each marriage license, the statement that "I solemnize the rite of matrimony between the above (or within) named parties on [the marriage date]." Tenn. Code Ann. § 36-3-304. This certification is "to be signed by the person solemnizing the marriage." *Id.* Plaintiffs assert that a ULC minister signing this statement could be subject to liability under Tenn. Code Ann. § 39-16-504(a)(1), which makes it a Class C misdemeanor to "[k]nowingly make a false entry in, or false alteration of, a governmental record." But that provision is intended to punish obstruction of justice and prevent tampering with governmental records. *See* Cathleen R. Smith, Tenn. Handbook Series: Criminal Offenses and Defenses in Tennessee § O30 (2018). It prohibits only a "false entry in" a

9

governmental record, and the ULC minister would be entering only a date and his or her name. The fact that the individual may not be authorized to solemnize the marriage does not render the name or date a "false entry." Moreover, speculation that a prosecution could be theoretically possible under a statute is not sufficient to establish standing; Plaintiffs must point to a credible threat of such prosecution. Section 36-16-504(a) does not present such a threat. *Contrast Universal Life Church v. Utah*, 189 F. Supp. 2d 1302, 1310 (D. Utah 2002) (finding ULC ministers did have standing to bring a declaratory judgment action because Utah law subjected any person who solemnized marriages "under pretense of having authority" to up to three years in prison); *cf.* Tenn. Att'y Gen. Op. 90-49 (Apr. 9, 1990) (concluding a minister who performs a marriage ceremony without a valid marriage license could be subject to a negligence claim but has not committed any criminal offense).

### 2. *Plaintiffs' challenge to Chapter 415 is not ripe.*

Plaintiffs' claims also fail under another of the justiciability doctrines—ripeness. The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir.1996) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). When there is no danger of imminent and certain injury to a party, an issue has not "matured sufficiently to warrant judicial intervention." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n. 10 (1975)); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) (A claim is not ripe for adjudication if it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all.").

The Supreme Court has established a two-part test for determining the ripeness of a claim: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. An issue is not fit for judicial decision "where the existence of the dispute itself hangs on future contingencies that may or may not occur." *Id.*

Case 2:19-cv-00049   Document 42   Filed 07/01/19   Page 10 of 28 PageID #: 222

Plaintiffs fail both parts of this test. First, the Plaintiffs' claims that Chapter 415 will infringe on their First Amendment rights depend on the contention that clerks in Tennessee will change their behavior with respect to marriage performed by ULC ministers. But, as the Tennessee Attorney General explained over twenty years ago, clerks perform only ministerial tasks with respect to issuing and recording marriage licenses and do not have "any discretion . . . to examine the qualifications of persons solemnizing the marriage." Exhibit B, Tenn. Att'y Gen. Op. 97-139, at 3. Clerks "shall forward" marriage licenses to the office of vital records, Tenn. Code Ann. § 36-3-103, and the only statutory duties of a clerk with respect to marriage licenses are "[t]o endorse on or append to marriage license the form of the return" and "[t]o register . . . the names of the parties, and the date of the issuance of a marriage license, and to copy . . . the return of the proper functionary who solemnized the rights of matrimony, with the date thereof, and file and retain the license and return thereof" in the clerk's office, *id.* § 18-6-109(a). Plaintiffs are correct that clerks may not issue a license "for a marriage that is prohibited" by Tennessee law. *See id.* § 36-3-103(c)(1). But that provision encompasses only *marriages* that are prohibited, *see id.* § 36-3-101 to -112 (prohibiting marriages involving, among things, close relatives, minors, and intoxicated individuals); it is unrelated to the question of whether a lawful marriage has been solemnized.

Plaintiffs' claims thus depend on the contingency that clerks will not follow the ministerial requirements of these statutes or the Tennessee Attorney General's longstanding interpretation of them in this context. There is nothing in the record demonstrating a clerk has not done so. And, even if there were, the clerk's failure to file a license would not injure Plaintiffs; it would affect only the couple who sought to have their marriage licensed filed.

Moreover, Plaintiffs claim is not ripe because the reach of Chapter 415 has not yet been established; depending on how it is interpreted, it may not affect Plaintiffs at all. Plaintiffs acknowledge that the term "online ordinations" is not defined in the statute and does not have a

11

readily apparent meaning. TRO Mem. 21-22. For example, it could encompass all ordinations for which any part of the training or required application occurs through email or the internet. Or it could cover only ordinations in which the final, official act of ordination occurs over the internet. A number of other factual scenarios raise additional questions: ordinations that occur over phone lines that utilize the internet, for example. Until Chapter 415 becomes effective, its scope and application, if any, cannot be established with any certainty. Nor can its potential application to Plaintiffs. ULC, for example, "ordains ministers on the internet, but sends credentials to ministers by mail." TRO Mem. 3. Plaintiffs' challenge to Chapter 415 is thus not ripe for judicial decision.

Plaintiffs will also not suffer any hardship from withholding court consideration at this time. Chapter 415 does not establish penalties for attempting to solemnize a marriage without authorization, and Plaintiffs will be no differently situated after the effective date of Chapter 415 than they were before it. Under the Attorney General's authoritative interpretation of Tennessee law, ULC ministers are not authorized to solemnize marriages under existing law. The hardship that Plaintiffs allege would not result from withholding judicial consideration; if there is any such hardship, it already exists.

This Court should not be drawn into abstract constitutional questions about the scope of the First Amendment's protections for freedom of religion and speech and how they apply to statute that has not yet been interpreted or enforced until a concrete controversy exists that requires judicial resolution in order to prevent hardship to a party. That has not yet occurred. And Plaintiffs claims will not ripen until it does.

> 3. *To the Extent Plaintiffs challenge the existing requirements of § 36-3-301(a)(2), their claim is time-barred because they have been aware of the claimed injuries since at least 2015 and should have been aware since 1997.*

Plaintiffs ask this Court to enjoin the "new law" because after its effective date ULC ministers will "no longer" be authorized to solemnize marriages. TRO Mem. 1. But Plaintiffs themselves

12

have recognized since at least 2015 that ULC ministers are not authorized to solemnize marriages in Tennessee. *See* Exhibit D, ULC Blog Post (June 26, 2015). And they should have been aware of that fact in 1997, when the Tennessee Attorney General issued a public opinion reaching that conclusion. Exhibit A, Tenn. Att'y Gen. Op. U97-041; Exhibit B, Tenn. Att'y Gen. Op. 97-139. Because of the existing requirements, Plaintiffs recognize that they cannot get the relief they seek unless this Court enjoins both Chapter 415 and the limitation in § 36-3-301(a)(2) that only ordinations or designations that occur pursuant to a "considered, deliberate, and responsible" act are sufficient to authorize a religious leader to solemnize marriages in the State. But given Plaintiffs' longstanding knowledge of the requirements of (a)(2) and the Attorney General's repeated public opinions, they cannot now seek to challenge the existing requirements of (a)(2). Those claims are time-barred.

The statute of limitations for claims arising under 42 U.S.C. § 1983 is determined by looking to state law. Because § 1983 claims are best characterized as tort actions for personal injury, federal courts borrow the statute of limitations from the relevant State's law. *See Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (citing *Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985)). Tennessee has a one-year statute of limitations for civil actions brought under federal civil rights statutes. Tenn. Code Ann. § 28-3-104. Therefore, to be permitted, Plaintiffs claims must have accrued on or after June 21, 2018. But they accrued much earlier.

The determination of when a claim accrues is a matter of federal, not state, law. A federal civil rights claim accrues when a plaintiff knows or has reason to know of the injury that is the basis of the plaintiff's action. *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). Plaintiffs' alleged injuries all result from the fact that Tennessee law does not authorize ULC ministers to solemnize marriages. But Tennessee has openly stated that fact since 1997, and the Plaintiffs should have been aware of that interpretation. At the latest, Plaintiffs were undoubtedly aware of the 2015 Attorney

13

General opinion on June 26, 2015, when ULC noted that opinion on its website and recognized that it interpreted Tennessee law not to authorize ULC ministers to solemnize marriages. *See* Exhibit D, ULC Blog Post (June 26, 2015). As a result, even prior to the effective date of Chapter 415, ULC's website has indicated that ULC ministers are "not generally" authorized to solemnize marriages in Tennessee and that the spiritual leaders authorized to solemnize marriages do not "include ministers of [ULC]." Exhibit E, "Tennessee Wedding Laws," https://www.ulc.org/wedding-laws/tennessee. Plaintiffs' have been aware of that fact for at least three years, and, in reality, much longer. Any claims against the existing requirements of § 36-3-301(a)(2), which have not changed in twenty years, are thus time-barred; Plaintiffs cannot use the recent enactment of Chapter 415 as a means to piggyback a time-barred challenge to those existing requirements.

### 4. Neither Chapter 415 nor § 36-3-301 violates the Establishment Clause.

The Establishment Clause requires the government to treat religious denominations equally, and one religious group or denomination "cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Sixth Circuit applies a two-step inquiry when analyzing Establishment Clause claims. *Harkness v. Secretary of Navy*, 858 F.3d 437, 447 (6th Cir. 2017). "First, if the challenged government practice prefers one religion over another," strict scrutiny applies. *Id.* "Second, if the challenged practice does not differentiate among religions," the court applies "the three-pronged test laid out in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)." *Id.* Plaintiffs do not argue that they have a strong likelihood of success under the second prong applying the *Lemon* test; instead they rely solely on the contention that Chapter 415 and § 36-3-301 "make[] explicit and deliberate distinctions between different religious organizations" and are thus subject to strict scrutiny under the first step of the Establishment Clause inquiry. TRO Mem. 11-12. But neither Chapter 415 nor the existing requirements of (a)(2) are facially discriminatory; both are neutral laws that apply equally to all spiritual leaders of any faith, denomination, or religious group.

14

A "suggestion of preference" is not sufficient to warrant strict scrutiny. *Harkness*, 858 F.3d at 447. Instead, the Sixth Circuit "require[s] a facial preference among religions to trigger strict scrutiny." *Id.* Plaintiffs, relying principally on the Supreme Court's decision in *Larson* and the Sixth Circuit's decision in *Wilson v. NLRB*, 920 F.2d 1282 (6th Cir. 1990), claim that Chapter 415 and § 36-3-301 discriminate among religions in three ways. First, they allege Chapter 415 "distinguishes between 'spiritual leader[s]' ordained online and those who are not." TRO Mem. 12. Second, they allege that the existing requirements of § 36-3-301 "distinguish[] between religions whose ordination 'customs' constitute, in the eyes of the state, a 'considered, deliberate, and responsible act,' and those whose customs do not rise to that level of solemnity." *Id.* at 13. Third, they contend that the existing requirement of § 36-3-301(a)(1) "facially distinguish[] between those religions that 'ordain[] or otherwise designate[]' 'spiritual leaders' and those that do not." *Id.* Each claim lacks merit.

First, unlike the laws at issue in *Larson* and *Wilson*, Chapter 415 does not facially distinguish among religions. The law at issue in *Larson* divided religious organizations into two mutually exclusive groups: religious groups that received more than half of their contributions from non-members or unaffiliated organizations and religious groups that did not. 456 U.S. at 231-32. The Court concluded that the law, by focusing on the source of a religious organization's funds, "effectively distinguishes between 'well-established churches' that have 'achieved strong but not total financial support from their members' on one hand, and 'churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members' on the other hand." *Id.* at 246 n.23. In *Wilson*, the Sixth Circuit applied *Larson* to find facially discriminatory a law that "exempt[ed] from union membership only those employees who are members of 'bona fide' religious organizations having the beliefs described in the statute." 920 F.2d at 1287.

15

Chapter 415 is distinguishable from the laws at issue in *Larson* and *Wilson*. First, it does not divide religious organizations into separate categories and treat one category more favorably, as the law at issue in *Larson* did. As Plaintiffs acknowledge, Chapter 415 "distinguishes between '*spiritual leaders*' ordained online and those who are not." TRO Mem. 12 (emphasis added). The distinction is thus among certain *individuals*, not religions. In fact, ministers or spiritual leaders within a single religion may be differently situated under the provision; ULC, or its direct ancestor church, for example, appears to have formerly ordained ministers by mail. *See Universal Life Church*, 189 F. Supp. 2d at 1307. ULC ministers ordained by mail would not be affected by Chapter 415, nor would ministers of other religions that offer multiple methods of ordination and have been ordained pursuant to another method. A law that distinguishes among individuals equally within religious organization does not facially discriminate among the religious organizations themselves.

Moreover, Chapter 415 does not, like the law at issue in *Wilson*, distinguish among "bona fide" religions and other religious groups. Nor does it, contrary to Plaintiffs' contention, distinguish between "well-established churches" and "churches which are new and lacking in a constituency." TRO Mem. 12 (quoting *Larson*, 456 U.S. at 246 n.23). Unlike the division among religions based on their funding, the use of the internet is not indicative of the nature of a religious organization or its resources. Both a well-established church and a new church may utilize the internet to ordain a minister when necessary, and, in all likelihood, a well-established church with sufficient resources to create and maintain a website would be more likely to be able to take such action online than would a church with fewer resources to pay for the technical skills and equipment that would be necessary. In short, Chapter 415 is not a distinction among religions and does not effectively divide religious groups into a favored category and an unfavored category. It addresses only the means used for each individual ordination. The fact that ULC relies heavily on the internet and its newer ministers may be disparately impacted by Chapter 415 is not sufficient to establish facial

16

discrimination.  *See Harkness*, 858 F.3d at 447-48; *see also Gilette v. United States*, 401 U.S. 437, 451-54 (1971) (rejecting a claim that the conscientious objector exemption discriminated on the basis of religion despite the fact that it disfavored some religious beliefs).

Second, the existing requirements of § 36-3-301(a)(1) and (a)(2), that an individual be "ordained or otherwise designated" pursuant to a religious custom that constitutes a "considered, deliberate, and responsible act" do not facially discriminate among religions.  Plaintiffs claim the requirement of ordination or designation distinguishes between religions that ordain or otherwise designate and those that do not.  Plaintiffs, of course, have no standing to make such a claim given that they do in fact "ordain" ministers.  But even if they did, a requirement that an individual be "ordained or otherwise designated" by his or her religious organization does not facially disfavor particular religions or establish a requirement that only particular "bona fide" religions will qualify.  To the contrary, "otherwise designate" is a catch-all phrase, designed to ensure all spiritual leaders recognized by their religions are encompassed within the statute even if their religion does not "ordain" ministers in an ecclesiastical sense.  *Cf. Cramer v. Commonwealth*, 214 Va. 561, 202 S.E. 911, 914 (1974) (noting that "ordain" as used in Virginia's marriage solemnization law is not used in the "ecclesiastical sense" but "has many definitions, including 'appoint,' 'arrange,' 'order,' or 'to establish by appointment'"); Tenn. Const. art. 6, § 1 (granting legislature the authority to "ordain and establish" inferior courts).

The requirement that a spiritual leader be recognized by his or her religion in some official manner satisfies the neutral requirement that the status of minister or spiritual leader is conferred by the religion, pursuant to its custom, and not simply a self-proclaimed title.  Similar requirements apply to other neutral laws that single out spiritual leaders of all faiths and denominations for special treatment, such as tax exemptions for ministers.  *See Gaylor v. Mnuchin*, 919 F.3d 420 (7th Cir. 2019) (holding that the tax exemption for "minister[s] of the gospel" does not violate the

17

Establishment Clause).  The IRS, for example, defines "ministers" as limited to individuals who are "duly ordained, commissioned, or licensed by a religious body constituting a church or church denomination" and who "have the authority to conduct religious worship, perform sacerdotal functions, and administer ordinances or sacraments."  IRS Publication No. 517, at 3 (2018), *available at* https://www.irs.gov/pub/irs-pdf/p517.pdf.

The requirement of (a)(2) that ordination or designation occur pursuant to a "considered, deliberate, and responsible act" serves a similar purpose and is not facially discriminatory.  The requirement, which is not unique to Tennessee law, *see Cramer*, 202 S.E. at 915, ensures that the title of minister, elder, or spiritual leader is not conferred without thought and consideration.  It applies equally to ministers and spiritual leaders of all religions and, unlike the law at issue in *Wilson*, does not include a substantive component requiring that the religion be "bona fide" or have certain beliefs.  *Wilson*, 920 F.2d at 1287.  It is a *procedural* requirement, not a substantive one, and one that reflects an inquiry similar to that undertaken by the Supreme Court in *Hosana-Tabor Evangelical Lutheran Church & School v. EEOC* in determining whether an individual qualified as a "minister" for purposes of the ministerial exception to Title VII.  565 U.S. 171 (2012).  Reversing the Sixth Circuit's determination that the individual in that case did not qualify as a minister, the Supreme Court noted her title "reflected a significant degree of religious training followed by a formal process of commissioning," that she "had to complete eight-college-level courses" in various religious subjects," that she "had to obtain the endorsement of her local Synod district," and that "she had to pass an oral examination."  *Id.* at 191.  Those procedures, among other factors, were sufficient to establish that she was a "minister."  *Id.*

Section 36-3-301(a)(2) establishes a similar procedural inquiry, authorizing only spiritual leaders who have been ordained or designated pursuant to a considered, deliberate, and responsible act to solemnize marriages in Tennessee.  Accordingly, the requirement in (a)(2) is not

18

"indistinguishable from the one in *Wilson*." TRO Mem. 13. It does not single out "religious organization having the beliefs described in the statute," *Wilson*, 920 F.2d at 1287; it distinguishes between ordinations conducted pursuant to a thoughtful, considered process and those that are provided "instantaneously" upon request without further inquiry. *See* Exhibit G, ULC Blog Post (Oct. 22, 2012) (noting it is "incredibly easy to get ordained" through ULC, which "allows people to become ordained online instantaneously"); *see also Cramer*, 202 S.E. at 915 ("The General Assembly was not concerned with preferring one sect over another . . . . The statue amounts to a blanket qualification of all ministers selected or elected by religious organizations and societies. But such a selection or election must be a consider, deliberate and responsible act. It must be an authoritative act.").

In sum, the Establishment Clause subjects to strict scrutiny laws that on their face prefer one religion or a group of religions over others. Neither Chapter 415 nor § 36-3-301 does so. Chapter 415 and § 36-3-301(a)(1),(2) do not facially discriminate among religions and are not analogous to, let alone "indistinguishable from," the laws at issue in *Larson* and *Wilson*. They merely require that a minister or spiritual leader of whatever religion be officially designated in a meaningful, non-perfunctory way. That requirement does not favor particular religious beliefs or sects and does not separate out for favored treatment a particular type of religion. As a result, the challenged provisions would, at most, be subject to the *Lemon* test. But Plaintiffs have not argued they would succeed under that test. Nor could they. *See Universal Life Church*, 189 F. Supp. 2d at 1314 n.11 (noting plaintiffs Establishment Clause challenge a Utah law very similar to Chapter 415 had not been properly raised but dismissing it summarily on the merits under the *Lemon* test anyway). Plaintiffs have thus not shown a strong likelihood of success on the merits of their Establishment Clause claims.

     *5. Neither Chapter 415 nor § 36-3-301 inhibits plaintiffs' free exercise of their religion.*

19

The Supreme Court has made clear that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt v. Hobbs*, 135 S.Ct. 853, 859 (2015) (citing *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990)). Instead, "only a law that is not neutral or of general applicability 'must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.'" *New Doe Child #1 v. Congress of the U.S.*, 891 F.3d 578, 591 (6th Cir. 2018) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993)). "A law is not neutral 'if the object of [the] law is to infringe upon or restrict practices because of their religious motivation,' or if 'the purpose of [the] law is the suppression of religion or religious conduct.'" *Id.* (alterations in original) (quoting *Lukumi*, 508 U.S. at 533). The Free Exercise Clause protects against "substantial burden[s] on the observation of a central religious belief or practice." *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989). Accordingly, "[i]n any free exercise claim, the first question is whether 'the belief or practice asserted is religious in the [plaintiff's] own scheme of things' and 'is sincerely held.'" *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987)).

Chapter 415 and § 36-3-301 are neutral, generally applicable laws that do not have as their object the purpose to infringe upon or restrict religious practices or to suppress religion or religious conduct. Most fundamentally, these laws do not affect ULC's ability to ordain whomever it chooses to ordain as a minster pursuant to whatever means ULC prefers, whether it be over the internet, by phone, in person, or by some other means. The laws affect only who is authorized to solemnize marriages in Tennessee. They impose no burden on ULC's ability to perform the religious acts of ordination and do not suppress ULC's practice of its religion in any way.

The only "practice" that Plaintiffs allege to be infringed or restricted by Chapter 415 is the practice of using the internet to ordain ministers. TRO Mem. 16 (arguing the Chapter 415 "was

20

motivated by hostility toward [ULC] for its practice of ordaining ministers through the internet"). But relying on that "practice" fails the "first question," in the free exercise analysis; Plaintiffs have not alleged that the use of the internet specifically as opposed to mail or in-person ordination is a sincerely held religious belief. *Maye*, 915 F.3d at 1083. As the Utah district court recognized analyzing a similar Utah law, "[n]owhere have Plaintiffs demonstrated that being ordained through application over the Internet . . . is a religious belief, much less that it is sincerely held." *Universal Life Church*, 189 F. Supp. 2d at 1313. Instead, ordination over the internet "is merely an administrative convenience." *Id.*

Plaintiffs assert that § 36-3-301(a)(2) is not a neutral, generally applicable law because it "'refers to a religious practice without secular meaning.'" TRO Mem. 15 (quoting *Lukumi*, 508 U.S. at 533. But the "practices" to which Plaintiffs are referring are "ordination" and "designation" of ministers in conformity with church customs. Section 36-3-301(a)(2), however, has no effect on those practices.

Plaintiffs also assert that Chapter 415 targets their religious practice specifically, citing the legislative history indicating the legislation's sponsor sought to stop someone from being able to solemnize marriages simply by going online and paying $50. TRO Mem. 15. According to Plaintiffs, that statement demonstrates that Chapter 415 "was motivated by hostility toward [ULC] for its practice of ordaining ministers through the internet." *Id.* at 16. Even accepting that as true, however, it cannot support a free exercise claim unless the practice of using the internet is a sincerely held religious practice rather than an administrative convenience or choice. Plaintiffs have made no showing that the use of the internet in its ordination proceedings has not only religious significance but is a "matter of conscience" for the religion. *Int'l So'y of Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981). And given that ULC existed prior to the widespread use of the internet and has apparently ordained ministers through other methods in the past, any such contention that

21

the use of the internet is a matter of conscience within the religion would be implausible.

### 6. Chapter 415 does not infringe Plaintiffs' freedom of speech.

The First Amendment, through the Fourteenth Amendment, prohibits States from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Laws that "target speech based on its communicative content" are therefore "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). But the First Amendment's "restrictions on expression are distinct from restrictions . . . on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.*

Because Chapter 415 does not restrict expression or target speech, Plaintiffs' free speech claim fails at the outset. As a preliminary matter, Chapter 415 does not prevent, hinder, or burden online ordinations in any way; as noted, it simply establishes that individuals who have received online ordinations are not authorized to solemnize marriages. Moreover, the fact that some speech or communication must occur for an ordination to be performed online does not automatically render any burden on that speech subject to strict scrutiny under the First Amendment. *See Sorrell*, 564 U.S. at 567. Using the internet, as opposed to an in-person ceremony or a telephone, for example, is not expressive conduct protected by the First Amendment. The "expressive component" of an ordination online is "not created by the conduct itself"—the use of the internet—"but by the speech that accompanies it." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). And the Supreme Court made clear in *Rumsfeld* that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' by simply talking about it." *Id.* For that reason, "a ban on race-based hiring may require

22

employers to remove 'White Applicants Only' signs; an ordinance against outdoor fires might forbid 'burning a flag'; and antitrust laws can prohibit 'agreements in restraints of trade.'" *Sorrell*, 564 U.S. at 567 (cleaned up). For the same reasons, the State may distinguish between ministers ordained online and those ordained by other means for purposes of solemnizing marriage without that regulatory distinction being subject to strict scrutiny.

Chapter 415 governs only which individuals may solemnize marriages in Tennessee. And, to the extent it regulates ordination at all, it regulates only the medium—the internet—through which ordination occurs. But Plaintiffs have not alleged that the internet itself has any expressive significance warranting First Amendment protection. The fact that protected speech is conveyed during that ordination is not sufficient under *Rumsfeld* and *Sorrell* to establish that Chapter 415's regulation is subject to strict scrutiny.

Plaintiffs simply assume that Chapter 415 regulates speech and is subject to First Amendment scrutiny, and they claim that scrutiny must be strict scrutiny for three reasons. First, Plaintiffs point out that Chapter 415 involves the internet and quotes the Supreme Court's recognition of the importance of the internet as an expressive medium. But the bare fact that a regulation relates to the internet is not sufficient to warrant strict scrutiny. Only content-based speech restrictions are subject to that exacting standard. Plaintiffs' second and third reasons are similar; they argue Chapter 415 is subject to strict scrutiny because it targets a particular type of speech, religious speech, and a particular message. But, as noted, Chapter 415 does not address the content or message of the speech in any way; nor does it restrict it. It distinguishes among the communicative methods used for ordination. Strict scrutiny is thus not applicable.

**B. The Other Factors Do Not Support Injunctive Relief Because Chapter 415 Does Not Alter the Authority of ULC Ministers Solemnize Marriages in Tennessee.**

The extraordinary relief requested by Plaintiffs is not warranted. "[T]here is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). And because Plaintiffs cannot show a strong likelihood of success on their First Amendment claims, their assertions as to the other factors also fail. *See Connecticut Distrib. Co.*, 154 F.3d at 288 (noting the likelihood of success prong in First Amendment cases is determinative of the other factors required to justify injunctive relief).

Chapter 415, in reality, does not alter the status quo for Plaintiffs that has existed for twenty years. *See* Exhibit F, Tenn. Att'y Gen. Op. 19-08 (June 20, 2019). Plaintiffs acknowledge that "the language regarding 'considered, deliberate, and responsible' act [in § 36-3-301(a)(2)] is not new," and also allege that in the past "ministers have reported that various county clerks have relied on the existing language to exclude them from performing marriages." TRO Mem. 24. But they have just now brought suit to challenge that language and Chapter 415, despite the fact that they have been on notice since at least 2015, and should have known since 1997, that ordination that requires no more than a name and address and click of a mouse is insufficient to authorize an individual to solemnize marriage in Tennessee. A plaintiff is not entitled to injunctive relief absent a showing of irreparable harm, a showing Plaintiffs cannot make given that there has been and will be no change in their status under Tennessee law. *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982) ("Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued.").

24

Plaintiffs' also allege that the balance of equities favors granting injunctive relief because "[i]f the Act takes effect, [ULC ministers] will be unable to solemnize marriage under Tennessee law, and any couples married by [ULC ministers] will have the validity of their marriages cast into doubt." TRO Mem. 24-25. But ULC ministers are already unauthorized to solemnize marriages in Tennessee; that is no additional harm. And Plaintiffs have no standing to raise harm to married couples. Moreover, as the Tennessee Attorney General explained in 1997, the fact that an individual not authorized to perform a marriage in Tennessee purported to do so does not necessarily render a marriage invalid. *See* Exhibit H, Tenn. Att'y Gen. Op. 97-138 (Oct. 9, 1997). Tennessee recognizes a marriage as presumptively valid "[w]here there is 'direct proof of the performance of a ceremony and consummation of marriage." *Duggan v. Ogle*, 25 Tenn. App. 467, 59 S.W.2d 834, 838 (1941). Chapter 415 also expressly recognizes the validity of marriages that have occurred prior to its effective date; as a result, no couples married by a ULC minister will have reason to "doubt" whether Chapter 415 renders their marriage void. Indeed, the issuance of extraordinary relief in this case may create more confusion and uncertainty about the law because the Court's decision to issue such relief would convey—incorrectly—that Chapter 415 does in fact alter Tennessee law with respect to ULC ministers.

In short, Chapter 415 does not materially alter Plaintiffs' status under § 36-3-301, a status that has been apparent and known by ULC for a number of years. In such circumstances, Plaintiffs cannot meet their burden to demonstrate irreparable harm or the necessity of immediate action.

**CONCLUSION**

This Court should deny Plaintiffs' Motion for Temporary Restraining Order.

Respectfully submitted,
HERBERT H. SLATERY III
Attorney General and Reporter


/s/    Leslie Ann Bridges
LESLIE ANN BRIDGES (BPR #011419)
Senior Deputy of Public Protection Section
and Counsel to the Attorney General
Office of the Tennessee Attorney General
Post Office Box 20207
Nashville, Tennessee 37202-0207
Telephone (615) 532-7688
Facsimile (615) 741-2009
Leslie.Bridges@ag.tn.gov

26

# CERTIFICATE OF SERVICE

I certify that, on the 1st day of July 2019, a copy of the foregoing Response was filed and served by operation of the Court's ECF/PACER system on the following counsel for the Plaintiffs:

Rocklan W. King III (BPRNo 030643)
424 Church Street, Suite 2700
Nashville, TN 37219
Phone: (615)259-1450
Fax: (615) 259-1470
rocky.king@arlaw.com

Lucian T. Pera (BPR No. 1164l)
Crescent Center
6075 Poplar Avenue, Suite 700
Memphis, TN 38119
Phone: (901) 524-5278
Fax: (901) 524-5378
lucian.peru@arlaw.com

Bruce E.H. Johnson
Ambika K. Doran
Robert E. Miller
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Phone: (206) 622-3150
Fax: (206) 757-7700
brucejohnson@dwt.com
ambikadoran@dwt.com
robertmiller@dwt.com.


Lisa M. Carson, BPR No. 14782
BUERGER, MOSELEY & CARSON, PLC
*Attorney for Defendant Elaine Anderson, in her official capacity as County Clerk of Williamson County, Tennessee*
306 Public Square
Franklin, TN 37064
Telephone: (615) 794-8850
lcarson@buergerlaw.com

Mary Neill Southerland, BPR No. 1583
*Attorney for Defendant William Knowles, in his official capacity as County Clerk of Hamilton County, Tennessee*
204 Courthouse, 625 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 209-6150
neills@hamiltontn.gov

Nicholas C. Christiansen, BPR No. 30103
*Attorney for Defendant Lisa Duke Crowell, in her official capacity as County Clerk of Rutherford County, Tennessee*
16 Public Square North
Murfreesboro, TN 37133
Telephone: (615) 893-552
nchristiansen@mborolaw.com

Jeffrey G. Jones
*Attorney for Defendant Wayne Nabors, in his official capacity as County Clerk of Putnam County, Tennessee*
1420 Neal Street
Cookeville, TN 38501
jjones@wimberlylawson.com


*/s/* Leslie Ann Bridges