# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEAST DIVISION

UNIVERSAL LIFE CHURCH MONASTERY   )
STOREHOUSE, a Washington non-profit   )
corporation; GALE PLUMM and TIMEAKA   )
FARRIS, a married couple; ERIN   )
PATTERSON, an individual; and GABRIEL   )
BISER, an individual,   )
   )
                Plaintiffs,   )
   )
        v.   )     No.  2:19-cv-00049
   )
WAYNE NABORS, in his official capacity   )
as County Clerk of Putnam County   )
Tennessee; LISA DUKE CROWELL, in her   )
official capacity as County Clerk of   )
Rutherford County, Tennessee; WILLIAM K.   )
KNOWLES, in his official capacity as County   )
Clerk of Hamilton County, Tennessee; ELAINE   )
ANDERSON, in her official capacity as County   )
Clerk of Williamson County, Tennessee;   )
HERBERT H. SLATERY III, in his official   )
capacity as Attorney General of the State of   )
Tennessee; JENNINGS H. JONES, in his official )
capacity as District Attorney General for   )
Rutherford County; NEAL PINKSTON, in his   )
official capacity as District Attorney General for )
Hamilton County; BRYANT C. DUNAWAY, in   )
in his official capacity as District Attorney   )
General for Putnam County; KIM R. HELPER, )
in her official capacity as District Attorney   )
General for Rutherford County; BILL LEE, in   )
his official capacity as Governor of the State of )
Tennessee,   )
   )
             Defendants.   )

## <u>MEMORANDUM OPINION</u>

This action for declaratory and injunctive relief under 42 U.S.C. § 1983, the Declaratory

Judgment Act, 28 U.S.C. § 2201, and the Tennessee Constitution arose after Tennessee's statute

regarding who may solemnize marriages was amended to prohibit persons who receive their ordinations online from performing civil marriages in Tennessee. Viewing this as a concerted effort by the state legislature "to exclude disfavored religious groups," (Doc. No. 1 at 5), Universal Life Church Monastery Storehouse (""ULC Monastery" or "the Church") and three of its ministers filed suit in this Court against four Tennessee County Clerks. After the County Clerks raised questions about whether they were proper Defendants, Plaintiffs amended their Complaint to add as Defendants the District Attorneys for each of the four counties, the Tennessee Attorney General, and the Governor of the State of Tennessee.

Now before the Court are Motions to Dismiss filed by all Defendants. Namely, Motions to Dismiss have been filed by (1) Lisa Duke Crowell, Rutherford County Clerk (Doc. No. 206); (2) Elaine Anderson, Williamson County Clerk (Doc. No. 210); (3) Wayne Nabors, Putnam County Clerk (Doc. No. 212); (4) William F. Knowles, Hamilton County Clerk (Doc. No. 215); and (5) Bill Lee, Governor of Tennessee; Herbert H. Slatery, Tennessee Attorney General and Reporter; Jennings H. Jones, Rutherford County District Attorney General; Neal Pinkston, Hamilton County District Attorney General; Bryant C. Dunaway, Putnam County District Attorney General; and Kim R. Helper, Williamson County District Attorney General (Doc. No. 208). Those Motions have been thoroughly briefed by the parties (Doc. Nos. 207, 209, 211, 213, 216, 222, 223, 224, 225, 226, 227 & 229), and are ripe for review.

## I. Factual Allegations[1] and General Background

ULC Monastery is a non-denominational religious organization headquartered in Seattle,

---

[1] The factual allegations are drawn from the governing Second Amended Complaint (Doc. No. 80) and accepted as true for purposes of the Motions to Dismiss.

Washington. (Doc. No. 80, ¶ 4). It was "formed to advance religious faith and freedom," and has two core tenets: "(1) a person should always strive to do that which is right, and (2) all people are naturally endowed with the rights to practice their beliefs, regardless of what those beliefs are, as long as they do not infringe the rights of others and are within the law." (Id. ¶ 23).

The Church ordains ministers over the internet at no cost, and sends credentials to the ministers so ordained by mail. (Id. ¶ 26). It also maintains a website where ministers can receive training and assistance on how to officiate weddings, deliver sermons, or found a church. Ministers can contact each other through a private social network maintained by ULC Monastery. (Id. ¶ 27).

Tennessee's statute regarding who may solemnize marriages is contained in Section 36-3-301. With the challenged amendment – underscored in the last sentence of the second paragraph below, and hereinafter referred to as "the Amendment" – the pertinent section provides:

> (1) All regular ministers, preachers, pastors, priests, rabbis and other spiritual leaders of every religious belief, more than eighteen (18) years of age, having the care of souls, and all members of the county legislative bodies, county mayors, judges, chancellors, former chancellors and former judges of this state, former county executives or county mayors of this state, former members of quarterly county courts or county commissions, the governor, the speaker of the senate and former speakers of the senate, the speaker of the house of representatives and former speakers of the house of representatives, members of the general assembly who have filed notice pursuant to subsection (l), law enforcement chaplains duly appointed by the heads of authorized state and local law enforcement agencies, members of the legislative body of any municipality in this state, the county clerk of each county, former county clerks of this state who occupied the office of county clerk on or after July 1, 2014, and the mayor of any municipality in the state may solemnize the rite of matrimony. For the purposes of this section, the several judges of the United States courts, including United States magistrates, United States bankruptcy judges, and federal administrative law judges, who are citizens of Tennessee are deemed to be judges of this state. The amendments to this section by Acts 1987, ch. 336, which applied provisions of this section to certain former judges, do not apply to any judge who has been convicted of a felony or who has been removed from office.

3

(2) In order to solemnize the rite of matrimony, any such minister, preacher, pastor, priest, rabbi or other spiritual leader must be ordained or otherwise designated in conformity with the customs of a church, temple or other religious group or organization; and such customs must provide for such ordination or designation by a considered, deliberate, and responsible act. <u>Persons receiving online ordinations may not solemnize the rite of matrimony.</u>

(3) If a marriage has been entered into by license issued pursuant to this chapter at which any minister officiated before July 1, 2019, the marriage must not be invalid because the requirements of the preceding subdivision (a)(2) have not been met.

Tenn. Code Ann. § 36-3-301(a) (emphasis added).[2]

ULC Monastery perceives the added language as part of an ongoing attack not only on it, but similar religious organizations. It points out that in 1998, "the legislature added language to exclude those whose religious customs do not provide for ordination 'by a considered, deliberate, and responsible act,'" with the intent being then, as now, "to target 'the mail-order preachers,' while allowing only ministers of more traditional religious groups to perform weddings." (Doc. No. 80, ¶ 30).

Turning to the individual Plaintiffs in this action, Erin Patterson became a ULC Monastery minister in 2015, and has solemnized five marriages (several in Rutherford County), and one vow renewal ceremony in Tennessee since then. (Id. ¶¶ 35, 37). She agreed to perform a marriage for a couple that resides in Williamson County on October 5, 2019, and arranged to meet with the bride to plan the ceremony on June 9, 2019. However, after learning of the 2019 Amendment to the statute, Patterson cancelled the meeting and told the couple she could not perform the ceremony. Patterson also told another couple that she could not perform their ceremony in the Nashville area on October 13, 2019, because of her continuing concerns about the Amendment. Patterson also

_____

[2] The Amendment was scheduled to take effect on July 1, 2019, but that was placed on hold by this Court's Orders maintaining the status quo. (Doc. Nos. 18, 53).

4

claims that before the Amendment was passed, she had begun coordinating with local zoning authorities in Rutherford Count to make changes to her property that would allow her to host weddings. (Id. ¶¶ 38, 39).

Gabriel Biser was also ordained as a ULC Monastery minister in 2015, and has solemnized four marriages in that role. He agreed to perform a ceremony for a same-sex couple in Hamilton County in August 2019, but changed his mind after the enactment of the Amendment. Nevertheless, as a Hamilton County resident, Biser intends to perform marriage ceremonies there in the future.

Finally, James Welch, a resident of Putnam County, became a ULC Monastery minister in 2018, and has solemnized two marriages in Tennessee since then.[3] On May 18, 2019, he was scheduled to perform the wedding ceremony for Plaintiffs Gale Plumm and Timeaka Farris in Cookeville, Tennessee. The day before the anticipated wedding, Plumm (who worked with Welch) left work early so that he could arrive at the Putnam County Clerk's Office before it closed. There, he met Farris and, together, they spoke with "an elderly woman" in the clerk's office who refused to issue them a marriage license because a ULC Monastery minister cannot perform a marriage ceremony in Tennessee, and any marriage so entered would be illegal. She also showed Plumm and Farris a copy of an Attorney General opinion relating to marriages performed by ULC Monastery ministers. According to Plaintiffs, Nabors intervened in the conversation and informed Plumm and Farris that a marriage license would not be issued if a ULC Monastery minister was to solemnize the marriage. As a result, the couple became distressed and had to travel to Jackson, Tennessee to be married. Though Plumm and Farris are now married, they still question the validity of their marriage

---

[3] Upon his request (Doc. No. 218), Welch was removed as a Plaintiff in this action (Doc. No. 235).

5

given what they were told at the Putnam County Clerk's office.[4]

The Second Amended Complaint is in ten counts and alleges assorted violations of the United States Constitution, including violations of the establishment, free exercise, and free speech clauses of the First Amendment, as well as violation of the due process and equal protection clauses of the Fourteenth Amendment. It also alleges violations of the Tennessee Constitution.

## II. Legal Analysis

Although there are five pending Motions to Dismiss, one each for the County Clerks, and a combined motion for the "State Defendants," there is a great deal of overlap in the arguments and common defenses raised. Accordingly, rather than discuss each motion separately, the Court considers the topics and arguments collectively raised by the Motions and how they affect a particular Defendant or groups of Defendants.

### A. Standing and Ripeness

The Court begins with standing because that is the threshold question in every federal case, Warth v. Seldin, 422 U.S. 490, 498 (1975), and without it the other defenses raised by Defendants are irrelevant. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" under Article III of the United States Constitution. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

"[T]he irreducible constitutional minimum of standing contains three element," Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992), that the plaintiff has the burden of establishing, FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990). At the pleading stage, Plaintiff "must allege specific, concrete facts," Warth, 422 U.S. at 498, demonstrating that he or she "(1) suffered an injury

---

[4] Nabors disputes the version of events presented by Plumm and Farris.

6

in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," Spokeo, 136 S. Ct. at 1547.  Further, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."  Warth, 433 U.S. at 511 (citing National Motor Freight Assn. v. United States, 372 U.S. 246 (1963).  Such associational or representational standing, however, does not eliminate the need for there to be a case or controversy under Article III and, therefore, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  Id.

There is a "close affinity" between standing and the ripeness doctrine,  Warth, 422 U.S. 490, 499 n.10, and both "share[] a foundation in Article III's case-and-controversy requirement."  Miller v. City of Wickliffe, 852 F.3d 497, 503 (6th Cir. 2017).  "Generally, a claim may not be adjudicated on its merits unless it is ripe."  Jackson v. City of Cleveland, 925 F.3d 793, 807 (6th Cir. 2019) (citing Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 284 (6th Cir. 1997).  "A claim is unripe when it is anchored in future events that may not occur as anticipated, or at all."  Id. (citation omitted).

"The ripeness doctrine exists 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'"  Id. (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985).  "Application of this doctrine 'requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances.'"  Id. (quoting Brown v. Ferro Corp., 763 F.2d 798, 801 (6th Cir. 1985)).  "Of primary importance is 'whether the issues tendered are appropriate for judicial resolution,' and, if so, the degree of

7

'hardship to the parties if judicial relief is denied' before the claim is allowed to ripen further." Id.

(quoting Young v. Klutznick, 652 F.2d 617, 625 (6th Cir. 1981)).

In variants of the same theme, each of the Defendants argues that there is no justiciable case

or controversy between them and Plaintiffs:

> (1) Williamson County Clerk Anderson argues that (a) "there is no credible threat of enforcement" of the statute by her, (b) "Plaintiffs have raised [a] purely hypothetical scenario in an effort to manufacture justiciability for claims against Ms. Anderson where there is none," and (c) "Plaintiffs cannot establish an injury 'fairly traceable' to Mrs. Anderson" because Patterson, the only Plaintiff who claims any connection to Williamson County "alleges that she *unilaterally* chose not to perform a ceremony for Williamson County couple based upon the passage of the 2019 Amendment[.]" (Doc. No. 211 at 14, 15). (emphasis added).

> (2) Rutherford County Clerk Crowell notes the lack of any allegation that "Patterson (or any other Plaintiff) has every been denied the ability to perform a wedding or otherwise had their license not processed in Rutherford County by Mrs. Crowell or any other Rutherford County Rutherford County official." (Doc. No. 207 at 14). To the contrary "Patterson has often and routinely performed weddings in Rutherford County," and there is no allegation that she "will somehow be denied the ability to perform weddings in the future in Rutherford County as a result of any action or inactions by Mrs. Crowell or any other Rutherford County official." (Id. at 15).

> (3) Hamilton County Clerk Knowles points out that "[d]espite a Second Amended Complaint and discovery, the Plaintiffs . . . have failed to establish an injury in fact caused by Mr. Knowles' lawful application of Tenn. Code Ann. § 36-3-301," and they have "made no discernable claim of injury that is 'fairly traceable to any action or inaction or Mr. Knowles," nor has he "presented any set of facts that would support the possibility that a judgment against Mr. Knowles could provide any measure of redress." (Doc. No. 216 at 12). Like his co-Clerks, Knowles argues that "Plaintiffs have failed to establish a justiciable controversy because Mr. Knowles does not have a 'real and adverse' interest to the Plaintiffs." (Id. at 13). Rather "[h]e has a purely ministerial duty to record marriage licenses as directed by the statute and has no duty, and in fact, no legal ability to defend the statutes of the State of Tennessee against constitutional challenges." (Id.).

> (4) Putnam County Clerk Nabors, like the other County Clerks, argues that there is no causal connection between Plaintiffs' alleged injuries and any action 'fairly traceable'" to him and neither he "nor Putnam County dictate the laws of the state of Tennessee." (Doc. No. 213 at 18). Rather, he "has a purely ministerial duty to issue

8

marriage licenses and to record and certify marriage certificates," and "is not even authorized to inquire into an officiant's compliance with the statute." (Id.).

(5)  Finally, the State Defendants echo the arguments made by the County Clerks. They also argue that "the conduct in which Plaintiffs wish to engage – solemnizing marriages for *civil* purposes – is 'not affected with a constitutional interest.'" (Doc. No. 209 at 20).  That is, (1) "[p]laintiffs suffer no cognizable injury from the fact that ULC ministers lack authority to solemnize marriages civilly in Tennessee"; (2) "[t]hey remain free to conduct whatever *religious* ceremonies they wish"; and (3) "[t]heir inability to solemnize a marriage civilly has no bearing on their religious practice or exercise.'" (Doc. No. 209 at 20) (emphasis in original).   Moreover, no Plaintiff has faced or been threatened with criminal charges, the statute itself contains no enforcement mechanism, and "any alleged injury depends on enforcement," which is "'a contingent future event that history tells us may never occur at all." (Id. at 23). As such Plaintiffs' claims are not ripe for review.

Read collectively, Defendants insist that the Church and its ministers cannot establish any of the three elements of standing and/or Plaintiffs' claims are not ripe.  Before addressing those argument, however, the Court considers the claims of Plumm and Farris, which the Court finds to be moot.

### 1.  *Plumm and Farris*

"Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'"  Arizonans for Official English v. Arizona, 520 U.S. 43, 68 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).  "A case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"  Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co., 714 F.3d 424, 429 (6th Cir. 2013) (quoting Hodges v. Schlinkert Sports Assocs., Inc., 89 F.3d 310, 312 (6th Cir. 1996)).  Thus, for example, a voter's claim that Tennessee's processing of in-person driver's licenses violated the National Voter Registration Act became moot when plaintiff successfully

registered to vote.  Howard v. Tennessee, 740 F. App'x 837, 840 (6th Cir. 2018).

The same logic applies here to Plumm and Farris.  The record is undisputed that they were married by a Universal Life minister at Dale Hollow Lake on May 19, 2019, and that a marriage license was issued by the Jackson County Clerk and after the ceremony the certificate of marriage was endorsed by the minister and returned to the Clerk.  (Doc. No. 116-4, Plumm Depo. at 8).  It is also undisputed that, under the terms of the statute as amended, "[i]f a marriage has been entered into by license issued pursuant to this chapter at which any minister officiated before July 1, 2019, the marriage must not be invalid," even if performed by a minister who received his or her ordination online.  Tenn. Code Ann. § 36-3-301(a)(3).  Simply put, there is no justiciable case or controversy between these Plaintiffs and any of the Defendants, nor is there a suggestion of a dispute that is capable of repetition yet evading review.  See Chirco v. Gateway Oaks, L.L.C., 384 F.3d 307, 309 (6th Cir. 2004) (citations omitted)  (noting that "[t]he Supreme Court has carved out a mootness exception for issues 'capable of repetition, yet evading review' where  (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again").[5]

## 2.  *Universal Life Church and Its Ministers, Patterson and Biser*

Defendants argue that Plaintiffs cannot meet any of the three elements of standing – injury in fact, traceability, or redressability.  The Court considers those arguments in turn.

_____

[5]  Technically, it may be "more accurate to say [Plumm and Farris] lacked standing to bring the[ir] claims, rather than say they are moot," Sumpter v. Wayne Cty., 868 F.3d 473, 490 (6th Cir. 2017), because by the time they were added to the case with the filing of the Second Amended Complaint,  they were already married and the effective date of the Amendment had passed.  Either way, they are not proper parties to this litigation.

*a. Injury in Fact*

The State Defendants begin by arguing that the Amendment (1) "does not 'proscribe' any conduct at all"; (2) "the conduct in which Plaintiffs wish to engage – solemnizing marriages for *civil* purposes – is not 'affected with a constitutional interest'"; and (3) "[t]here is no recognized right to solemnize a marriage for civil purposes.'" (Doc. No. 209 at 20) (emphasis in original). Maybe so, but the State Defendants fundamentally misconstrue Plaintiffs' claims. Plaintiffs allege, instead, that they are treated differently than others in violation of the First Amendment, and more specifically that they are being subjected to religious discrimination because they are prohibited from performing marriage ceremonies that other ministers of more traditional religions are authorized to perform. In any event, "wedding ceremonies are protected expressions under the First Amendment," Kaahumanu v. Hawaii, 682 F.3d 789, 799 (9th Cir. 2012), and "[t]he clearest command of the Establishment clause is that one religious denomination cannot be officially preferred over another," Larson v. Valente, 456 U.S. 228, 244 (1982). "A state could not, for example, permit Catholic priests to solemnize weddings while forbidding Baptist ministers to do so," Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk, 758 F.3d 869, 872 (7th Cir. 2014), yet that essentially is Plaintiffs' argument here.

Next, the State Defendants argue that Plaintiffs cannot show injury because, even before the Amendment, Universal Life Ministers were not allowed to performing civil ceremonies. That is, the statute already prohibited ULC Monastery ministers from perform civil marriage ceremonies because it allowed only "regular ministers" who have the "care of souls," to perform such services and the ULC Monastery ministers do not meet those requirements. However, and leaving aside the question of why the legislature would chose to amend a statute to prohibit what it already prohibited,

11

this is a merits argument. Under the well-established "order-of-decision doctrine," <u>Children's Hosp.</u> <u>Med. Ctr. of Akron v. Youngstown Assocs. in Radiology Inc.</u> 612 F. App'x 836, 837 (6th Cir. 2015), "[b]efore turning to the merits, [a court] must address the plaintiffs' standing to raise . . . constitutional claims and . . . must do so even though some of those constitutional claims are easier to resolve than the standing question attached to them." <u>1064 Old River Road, Inc. v. City of</u> <u>Cleveland</u>, 137 F. App'x 760, 764 (6th Cir. 2005); <u>see also</u> <u>Trollinger v. Tyson Foods, Inc.</u>, 370 F.3d 602, 612 (6th Cir. 2004) ("Standing poses a threshold question involving constitutional, prudential and . . . statutory limitations on who may sue, regardless of the merits of that person's claim.").

A better (though ultimately unsuccessful) argument, and one joined by the County Clerks, is that Plaintiffs have failed to establish harm because there have been no prosecutions or threats of prosecution as a result of Amendment. Acknowledging as much, ULC Monastery is nevertheless concerned that its ministers face the threat of criminal liability were they to perform marriages in this state because Tennessee law requires (1) "that a person who solemnizes a marriage endorse the marriage license and return it to the county clerk within three days, and a minister who 'fails to make such return of the licenses commits a Class C misdemeanor" Tenn. Code Ann. § 36-3-303(a); and (2) a person who "'[k]nowingly make[s] a false entry in . . . a government record' – such as potentially by returning a marriage license the ministers knows is invalid – commits a Class A misdemeanor. Tenn. Code Ann. § 39-16-504(a)(1)." (Second Amended Complaint ¶ 31).

In response, the State Defendants point out that the Amendment itself has no enforcement provision, and they argue that Plaintiffs' fear of prosecution is unfounded. The State Defendants argue that Tenn. Code Ann. § 36-3-303(a), criminalizes only the "fail[ure] to . . . return [] the [marriage] license" within three days. As such, it has nothing to do with the minister's authority to

solemnize the marriage, and certainly not ULC ministers because they were not authorized to solemnize marriages in the first place. (Doc. No. 209 at 10-11). The State Defendants also argue that the second criminal provision on which Plaintiffs rely is inapplicable because ministers who sign their own true names could not have knowingly made a false entry into a government record. (Id. at 11).

The Court finds it unnecessary to delve too deeply into these arguments other that to say that "[i]n some cases, the authentic interest of the plaintiff engaging in the prohibited conduct can establish standing even though the only threat of enforcement comes from the very existence of the statute." Leverett v. City of Pinellas Park, 775 F.2d 1536, 1539 (11th Cir. 1985). One might wonder why the legislature added the online ordination prohibition for those like Universal Life Monastery ministers if they were already barred from performing recognized ceremonies, unless the Amendment was intended to provide the statute with some teeth and confirm what the Attorney General has allegedly been opining all along. Regardless, the Court finds it unnecessary to wrestle with the probabilities of prosecution or other enforcement because of the claims presented and the nature of the relief sought.

Among other things, Plaintiffs allege that the statute as amended violates their free speech and free exercise rights, as well as the establishment clause, and they seek prospective injunctive and declaratory relief. It is well-established that "[s]tanding is relaxed in the First Amendment context," Faith Baptist Church v. Waterford Twp., 522 F. App'x 322, 330 (6th Cir. 2013), and it has been observed that "whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low," Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003). Indeed, the Sixth Circuit has held that "'[t]he use of governmental authority to encourage

13

a sectarian religious view is a sufficient injury if directed toward the plaintiff.'" <u>Adland v. Russ</u>, 307 F.3d 471, 478 (6th Cir. 2002) (quoting <u>Washegesic v. Bloomingdale Pub. Schs.</u>, 33 F.3d 679, 681 (6th Cir.1994)); <u>see also</u> <u>New Doe Child #1 v. Cong. of United States</u>, 891 F.3d 578, 585–86 (6th Cir. 2018) ("An allegation that the Government is compelling a particular person to violate personal religious beliefs . . . states an Article III injury-in-fact."). Thus, "in a pre-enforcement review case under the First Amendment (like this one), courts do not closely scrutinize the plaintiff's complaint for standing when the plaintiff 'claims an interest in engaging in protected speech that implicates, if not violates, each [provision of the law at issue].'" <u>Platt v. Bd. of Comm'r on Grievances</u>, 769 F.3d 447, 456 (6th Cir. 2014) (quoting <u>Carey v. Wolnitzek</u>, 614 F.3d 189, 196 (6th Cir. 2010)).

Further, numerous circuit have recognized that the concept of injury for purposes of standing is particularly elusive in Establishment Clause cases. <u>Barber v. Bryant</u>, 860 F.3d 345, 353 (5th Cir. 2017); <u>Awad v. Ziriax</u>, 670 F.3d 1111, 1122 (10th Cir. 2012); <u>Suhre v. Haywood Cty.</u>, 131 F.3d 1083, 1086 (4th Cir. 1997); <u>Saladin v. City of Milledgeville</u>, 812 F.2d 687, 691 (11th Cir. 1987). This is because Establishment Clause injuries are often "spiritual and value-laden, rather than tangible and economic," <u>Moss v. Spartanburg Cty. Sch. Dist. Seven</u>, 683 F.3d 599, 605 (4th Cir. 2012), and they "may be shown in various ways," <u>Ariz. Christian Sch. Tuition Org. v. Winn</u>, 563 U.S. 125, 129 (2011). "Some plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion," while others "may demonstrate standing on the ground that they have incurred a cost or been denied a benefit on account of their religion." <u>Arizona Christian Sch. Tuition Org. v. Winn</u>, 563 U.S. 125, 129–30 (2011).

In keeping with the relaxed standard in the First Amendment context, the Supreme Court recently found standing to exist under the Establishment Clause in <u>Trump v. Hawaii</u>, 138 S. Ct. 2392

14

(2018). There, the State of Hawaii and some of its residents filed a pre-enforcement action against the President and others, seeking to prohibit the enforcement and implementation of a Presidential Proclamation that barred entry into the United States by nationals from six predominately Muslim countries. Discussing Article III's requirement that there be an actual case or controversy, the Court observed:

> One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue. Standing requires more than just a "keen interest in the issue." It requires allegations—and, eventually, proof—that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains. In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is "directly affected by the laws and practices against which [his] complaints are directed."

Id. at 2416 (internal citations omitted). Recognizing that "the entry restrictions apply not to plaintiffs themselves but to others seeking to enter the United States," the Supreme Court nevertheless found standing to exist because of a "concrete injury: the alleged real-world effect that the Proclamation has had in keeping them separated from certain relatives who seek to enter the country." Id. This remained so, notwithstanding the Government's argument that the Establishment Clause "does not give them a legally protected interest in the admission of particular foreign nations," because that argument "depends on the scope of plaintiffs' Establishment Clause rights" and "concerns the merits rather than the justiciability of plaintiffs' claims." Id.

Much the same can be said about the Plaintiffs and the claims in this action. Plaintiffs have alleged real world injuries because the Amendment dissuades the ministers from performing weddings and congregants from having weddings performed by Universal Life Monastery ministers. "By showing a purpose to favor religion, the government sends the . . . message to . . . nonadherents that they are outsiders, not full members of the political community, and an accompanying message

15

to adherents that they are insiders, favored members[,]" <u>McCreary Cty., Ky. v. Am. Civil Liberties</u> <u>Union of Ky.</u>, 545 U.S. 844, 860 (2005), and "feeling of marginalization and exclusion are cognizable form of injury" for purposes of the Establishment clause, <u>Deal v. Mercer Cty. Bd. of</u> <u>Educ.</u>, 911 F.3d 183, 189 (4th Cir. 2018) . Furthermore, "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." <u>Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of</u> <u>Jacksonville</u>, 508 U.S. 656, 666 (1993). Plaintiffs have established injury in fact.

This Court's conclusion on this issue is supported by <u>Universal Life Church v. Utah</u>, 189 F. Supp.2d 1302 (D. Utah 2002), a case presenting similar facts on the question of standing.[6]  At issue there was a recently enacted Utah statute that prohibited ministers who received their ordination online or through the mail from performing valid marriage ceremonies. There, like here, Universal Life and one of its ministers filed suit raising constitutional challenges to the statute. There, like here, the defendants argued (1) "the statute does not affect plaintiffs because, regardless of the Challenged Statute, plaintiffs cannot perform marriages in any event because they are not ministers . . . in 'regular communion with any religious society'" as required by already existing state law; and (2) plaintiffs "have not suffered, and cannot suffer any injury in fact" because "they have never been threatened with prosecution" and "the challenged statute does not create a new or different crime."

---

[6] Despite the similarities, <u>Universal Life Church</u> is not discussed by the parties, notwithstanding the extensive briefing in this case.  Why that is so is a mystery to the Court.  True, it is an out-of-circuit, district court decision, but that did not stop the parties from citing and discussing other such authority.

Id. at 1308. And, there like here, the arguments were rejected.

In Universal Life, the court found it unnecessary to resolve the question of whether Universal Life ministers were already barred from performing marriage ceremonies because plaintiffs had standing to challenge the statute, notwithstanding the lack of any prosecution under the amended statute. The court found the case to be "one of those exceptional cases in which standing exists despite the lack of any actual or threatened prosecution of Plaintiffs" and that the minister "ha[d] a personal stake in the outcome sufficient to assure an adversarial presentation of the case." Id. at 1310. The court further noted that "one of the tenets of the ULC is to act within the law," and that the minister "should not be required to violate the law and risk prosecution in order to seek a determination regarding whether he can continue a practice in which he has engaged for many years without fear of prosecution." Id. at 1311.

### B. Traceability and C. Redressability

The County Clerks argue Plaintiffs cannot show any injury that is fairly traceable to them.[7] After all, the County Clerks did not promulgate either the statute or the Amendment, nor are they responsible for taking any enforcement action with regard to any alleged violations of the statute. Further, with the possible exception of Nabors, the Clerks did not deny any request for issuance of a marriage license to any of the individual Plaintiffs in this case, and that the ministers may have unilaterally chosen to cancel ceremonies cannot be blamed on the County Clerks.

Under Tennessee law, a valid marriage can only occur if the couple obtains a marriage license from a county clerk, and the officiant signs and returns the license to the County Clerk. The

---

[7] In the section of their brief devoted to the issue of standing, the State Defendants do not argue the traceability element. Instead, their focus is on the alleged lack of a cognizable injury and the alleged inability of Plaintiffs to secure relief. (Doc. No. 209 at 18-22).

17

Amendment prohibits ULC ministers from signing the license and if they do the license is not valid.

T.C.A. § 18-6-109 (a)(2)(the County Clerk must register and file "the return of the <u>proper</u>

functionary who solemnized "the marriage".).  As Judge Aleta A. Trauger has explained:

> As far as the law of Tennessee is concerned, without a valid license, the plaintiffs
> do not have a valid marriage.  The Tennessee Code section on marriage "licenses and
> permits" states that, "before being joined in marriage, the parties shall present to the
> minister or officer a license under the hand of a county clerk in this state, directed to
> such minister or officer, authorizing the solemnization of a marriage between the
> parties. Such license shall be valid for thirty (30) days from its issuance by the clerk."
> T.C.A. § 36–3–103(a)(emphasis added).  Multiple other code provisions reinforce
> this notion that obtaining a valid license from the county clerk is a necessary step
> toward a valid marriage, as it protects the State against recognizing marriages that are
> contrary to the public interest. <u>See</u> T.C.A. § 36–3–109 (prohibiting the issuance of
> a marriage license to anyone who appears at the time of application to be "drunk,
> insane, or an imbecile.")

<u>Becker v. Judd</u>, 646 F. Supp. 2d 923, 925 (M.D. Tenn. 2009); <u>see also</u> <u>Ochalek v. Richmond</u>, 2008

WL 2600692, *3 (Tenn. Ct. App. June 30, 2008) ("obtaining a marriage license is a condition

precedent to the solemnization of a valid marriage under Tennessee law").  "Plainly, in order to have

a valid, recognized marriage under Tennessee law, there must be a marriage license."  <u>Id.</u>  Just as

plainly, Tennessee law prohibits County Clerks "from issuing a license for a marriage that is

prohibited in this state" and permits clerks to record only a license that were "properly signed by an

officiant." Tenn Code Ann. § 36-3-103(c)(1).  Inherent in a County Clerk's duties, therefore, is the

obligation to determine whether an executed  marriage license is proper and to do so perforce

requires the County Clerk to determine whether a license is signed by a proper and recognized

officiant.  Indeed, "[a]s the Sixth Circuit has observed,  . . . a plaintiff challenging a state marriage

statute may do so by suing the clerk who issues marriage licenses."  <u>Nashville Cmty. Bail Fund v.</u>

<u>Gentry</u>, 446 F. Supp. 3d 282, 301 (M.D. Tenn. 2020) (citing <u>Durham v. Martin</u>, 905 F.3d 432, 434

(6th Cir. 2018)). T.C.A. § 18-6-109 (a)(2). While the Clerks themselves may not have refused to issue a license because of the Amendment, the ministers have indicated an intention to continue to perform wedding ceremonies in the future and the Clerks will be obligated to record and certify the executed licenses in accordance with Tennessee law.

For much the same reason, Plaintiffs have established the redressability element of standing as it relates to the Clerks. In a very real sense, the County Clerks hold the keys to valid marriages in this state. A judgment in favor of Plaintiffs would enjoin the Clerks from rejecting an executed marriage licenses or turning away ULC Monastery Ministers. Even in the cases where Clerks intend to issue marriage licenses to ULC Monastery ministers and their congregants (notwithstanding the Amendment), a judgment invalidating the Amendment would redress Plaintiffs' injury by forcing them to accept legally valid executed licenses.

As for the State Defendants, they argue (again) that the relief Plaintiffs request will not address their alleged injuries because the statute, even before the Amendment, did not allow ULC Monastery ministers to perform recognized marriages in Tennessee. And again, that is a merits argument to be addressed later in these proceeding if necessary.

The long and the short of it is that "Plaintiffs have standing to challenge the Amendment because Plaintiffs have alleged a desire and an intent to engage in a course of conduct arguably affected with a constitutional interest but proscribed by statute, there is a causal relationship between the threatened injury and the challenged conduct, and there is a likelihood that the injury would be redressed by a favorable decision." Universal Life, 189 F. Supp.2d at 1312.

## B. Sovereign Immunity

"From birth, the States . . . have possessed certain immunities from suit in . . . federal courts."

19

Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005) (citing Alden v. Maine, 527 U.S. 706, 713 (1999)). "The States' immunity from suits in federal court applies to claims against a State by citizens of the same State as well as to claims against a State by citizens of another State." Id. (citing Hans v. Louisiana, 134 U.S. 1, 13 (1890)). Because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," most such suits are barred. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

There are, however, several recognized exceptions to this rule, including the Ex parte Young doctrine. See Edelman v. Jordan, 415 U.S. 651, 664 (1974) (describing Ex parte Young as "a watershed case"). "Under the Ex parte Young exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law . . . regardless of whether compliance might have an ancillary effect on the state treasury[.]" S & M Brands, Inc. v. Cooper, 527 F.3d 500, 507–08 (6th Cir. 2008) (internal citations omitted). While this "exception does not extend . . . to any retroactive relief," it "is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." Id. at 508 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14 (1983)).

To determine if Ex parte Young applies, a court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Boler v. Earley, 865 F.3d 391, 412 (6th Cir. 2017) (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)). Even so, in order to avail oneself of the Ex parte Young exception, a plaintiff must identify a state officer or officers appropriate to his or her claim. Each of the Defendants here claim that they are entitled to sovereign immunity and therefore not proper parties to this litigation.

20

### *1. Governor Lee*

In Tennessee, the governor is the state's chief executive officer, and is responsible for taking "care that the laws be faithfully executed." Tenn. Const. art. III, § 10. It does not necessarily follow, however, that Governor Lee should remain as a defendant because "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." Russell v. Lundergan–Grimes, 784 F.3d 1037, 1048 (6th Cir. 2015). Instead, "[t]he state official sued [ ] must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains." Floyd v. Cty. of Kent, 454 F. App'x 493, 499 (6th Cir. 2012). Thus, for example, the Governor of Michigan was a proper party in case involving the Flint water scandal where it was alleged he "participat[ed] in 'creating, escalating, and prolonging the dangers' to Flint water consumers." Boler v. Earley, 865 F.3d 391, 412 (6th Cir. 2017).

Plaintiffs allege no such connection here. Instead, they rely heavily on this Court's decision in Doe v. Haslam, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), which found the Governor to be a proper defendant in a suit challenging Tennessee's sex offender registration statutes. In doing so, the Court relied upon a footnote in Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656, 665 n.5 (6th Cir. 1982), wherein the Sixth Circuit found the Governor of Ohio to be a proper defendant in a case challenging trade practices relating to the film industries. The Sixth Circuit observed that "[e]ven in the absence of specific state enforcement provisions, the substantial public interest in enforcing the trade practices legislation involved here places a significant obligation upon the Governor to use his general authority to see that state laws are enforced[.]" Other courts considering the constitutionality of Tennessee's sex offender registration

statute have found the Governor to be entitled to immunity, notwithstanding <u>Allied Artists</u>.  <u>See</u>

<u>Roath v. Lee</u>, No. 3:17-CV-00995, 2019 WL 3066533, at *24 (M.D. Tenn. July 12, 2019)

(dismissing governor because no allegation that he did anything in relation to the sex offender

statutes); <u>Doe v. Haslam</u>, No. 3:17-CV-217, 2017 WL 4782853, at *4 (E.D. Tenn. Oct. 23, 2017)

(finding that "Governor Haslam's 'general authority' in enforcing the Act is not enough" to

overcome immunity defense).

  Although this Court found the governor to be a proper defendant in <u>Doe</u>, it reaches the

opposite conclusion here, again based upon <u>Allied Artists</u>.  Important to the Sixth Circuit's decision

in <u>Allied Artists</u> was the "significant obligation" the Governor would presumably be under because

of the "substantial public interest" in enforcing the legislation.  The same was trued in <u>Doe</u>.  <u>See</u>

<u>Doe</u>, 2017 WL 5187117, at *9 (noting that "Tennessee General Assembly has 'recognized the

substantial interest in protecting the public from sexual offenders, especially those who are repeat

offenders,'" and that "nothing filed by the Defendants in this case has suggested that the Defendants

consider the enforcement of Tennessee's scheme to be of anything other than the utmost

importance").

  While the Amendment at issue here is an important piece of legislation, there is no

suggestion that it will engender a visceral response by the Governor such that he would feel the need

to go out of his way to enforce it.  Indeed, the only mention of the Governor in the Second Amended

Complaint is that he "'is an elected official, invested with the supreme executive power of the

state,'" and that his "duties include taking care that the laws be faithfully executed."  (Doc. No. 80,

Second Amended Complaint ¶ 57).  Put simply, Plaintiffs have "only named the Governor as a

Defendant and ha[ve] said nothing about the Governor's involvement in this case and his connection

to the Act's enforcement. Saying nothing is not enough." Kelly v. Lee, No. 1:18-CV-00170-DCLC, 2020 WL 2120249, at *3 (E.D. Tenn. May 4, 2020).

Moreover, and assuming it is still good law,[8] the key to the conclusion in Allied Artists was that, without the Governor (and the only one sued), plaintiffs "would be unable to vindicate the alleged infringement of their constitutional rights without first violating [the] statute requiring a significant change in their business conduct." Allied Artists, 679 F.2d at 65. That is not the case here because Plaintiffs have also sued the Attorney General, and the District Attorney Generals and Clerks in the counties where they want to perform wedding ceremonies. See Kelly, 2020 WL 212049 at *3 (finding governor not a proper party because plaintiff could "vindicate his constitutional rights with the governmental parties he has named in his case," including the Attorney General, the Director of the Tennessee Bureau of Investigation, and the local sheriff).

There must be some connection or some special relation between the law in question and the official sued, otherwise, "the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general." Ex parte Young, 209 U.S. at 157. Because no such connection has been alleged against Governor Lee, he will be dismissed from this action.

### 2. Attorney General Slatery

Even though the Tennessee Attorney General does not have any authority to initiate criminal prosecutions on his own, see Tenn. Code Ann. §§ 8-6-109, 8-7-103, and even though he has no specific role in enforcing or regulating marriages under Tenn. Code Ann. § 36-3-301, Attorney General Slatery's request for dismissal on immunity grounds requires little discussion for two

---

[8] In Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1417 (6th Cir. 1996), the Sixth Circuit described Allied Artists as an "anomalous holding" insofar as the governor was not found to be entitled to Eleventh Amendment immunity.

23

reasons.

First, "[w]here parties challenge the constitutionality of any Tennessee statute, Tennessee law requires the Attorney General to be a party defendant in any [such] proceeding where the constitutionality of the Act of the legislature is before the Court on declaratory judgments proceeding." Kelly, 2020 WL 2120249, at *3 (quotations omitted) (collecting cases). In addition, state law provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration," and that if a challenged statute "is of statewide effect and is alleged to be unconstitutional, the attorney general and reporter shall also be served with a copy of the proceeding and be entitled to be heard." Tenn. Code Ann. § 29-14-107.

Second, Plaintiffs allege a connection between the Tennessee Attorney General and the treatment of its ministers because of opinions that his (and his predecessor's) office have issued over the years. Such opinions were issued in accordance with the Attorney General's duty to "give the governor, secretary of state, state treasurer, comptroller of the treasury, members of the general assembly and other state officials, when called upon, written legal opinions on all matters submitted by them in the discharge of their official duties." Tenn. Code Ann. § 8-6-109(b)(6).

Specifically, Plaintiffs allege:

In 1997, the Attorney General issued an opinion stating that a "person ordained by the Universal Life Church, Inc. . . . does not appear to meet the criteria of [Tennessee law] in order to be qualified to solemnize marriages." Tenn. Att'y Gen. Op. U97-041 (Sept. 2, 1997). The Tennessee Legislature then amended the law to include the Attorney General's statement that ordination must include a "considered, deliberate and responsible act." In 2015, the Attorney General again opined that ULC Monastery ministers may not solemnize marriages in Tennessee. Tenn. Att'y Gen. Op. 15-14 (Feb. 6, 2015). County clerks in Tennessee have relied on these opinions in refusing to issue marriage licenses to ULC Monastery ministers and in advising

24

ministers that they lack authority to perform weddings.

(Doc. No. 80, Second Amended Complaint ¶ 56). Since the Amendment passed, the Attorney General has confirmed that, under the new law, "spiritual leaders who receive their ordinations online will no longer be . . . authorized . . . to solemnize marriages in Tennessee." (Doc. No. 222 at 13).

To be sure, and as Defendants point out, the mere fact that an Attorney General's duties include issuing advisory opinions does not necessarily make him or her a proper defendant to a suit rasing a constitutional challenge to a law. See McBurney v. Cuccinelli, 616 F.3d 393, 401 (4th Cir. 2010) (stating that Ohio Attorney General's "general authority to issue advisory opinions, in the abstract, is not sufficient to establish a 'special relation' for Ex parte Young purposes," but "express[ing] no opinion on whether a special relationship would exist if an agency relies on an advisory opinion"); 1st Westco Corp. v. Sch. Dist. of Philadelphia, 6 F.3d 108, 114 (3d Cir. 1993) (stating that "the act of issuing an opinion about an abstract constitutional issue falls far short of enforcing, or threatening to enforce, a statute against a specific party"). But the allegations here go far beyond the Attorney General simply penning advisory opinions.

In addition to the general allegation that the Attorney General has issued advisory opinions on which the County Clerks rely, (Doc. No. 80, Second Amended Complaint ¶ 56 ("County Clerks in Tennessee have relied on those opinions in refusing to issue marriage licenses to ULC Monastery ministers and advisory ministers that they lack authority to perform weddings,") the Plaintiffs' specifically allege that at least one Clerk has acted upon those advisory opinions. The Second Amended Complaint alleges that when Plumm and Farris went to the Putnam County Clerk's office to obtain a marriage license, they were shown a copy of "an Attorney General Opinion regarding

25

marriages performed by ULC Monastery ministers," and were not issued a license by Nabors because of the denomination of their minister.  (Doc. No. 80, Second Amended Complaint ¶ 48).  This is enough to show the Attorney General "has some connection with the enforcement of the act."  Ex parte Young, 209 U.S. at 157; see Durham v. McWhorter, 789 F. App'x 533, 534 (6th Cir. 2020) (in case alleging denial of benefits after state representative was expelled from the General Assembly, state finance commissioner as the official "who decided that [plaintiff] was not entitled to those benefits" was not entitled to sovereign immunity); Gay Lesbian Bisexual Alliance v. Evans, 843 F. Supp. 1424 (M.D. Ala. 1993), aff'd, 110 F.3d 1543 (11th Cir. 1997) (in case challenging state statute restricting the free speech and association rights of gay and lesbians, Alabama Attorney General was proper defendant where it was "allegedly in reliance on an 'advisory opinion' from the Attorney General" that statute was enforced).  Attorney General Slatery will not be dismissed on immunity grounds.

### 3. *The District Attorney Generals*

By statute, District Attorney Generals are responsible for prosecutions in their respective county (or counties).  Tenn. Code Ann. 8-7-103.  Acknowledging as much, the District Attorney Generals nevertheless argue that they are not proper Defendants because (1) Plaintiffs have not shown a plausible basis for prosecution, and (2) the District Attorney Generals have not prosecuted or even threatened prosecution of Universal Life Monastery ministers.  The former argument has already been addressed by the Court.  As for the latter, conspicuously absent from the State Defendants' briefs are clear specific affirmative statements that the Amendment will not be enforced, *i.e.* Tennessee will ignore its statute and ULC Monastery marriages will somehow become valid, notwithstanding the Amendment's ban for online-ordained ministers.  Courts "assume a credible

threat of prosecution in the absence of compelling contrary evidence," New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 15 (1st Cir. 1996), because "[t]he Supreme Court has instructed [them] that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute," Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 687 (7th Cir. 1998) (citation omitted) (emphasis in original).

The lack of any definitive disavowal of an intent to enforce the Amendment aside, the fact remains that the District Attorneys are prosecutors who could decide to enforce the law. This is sufficient to make them proper Defendants. In this regard, the Sixth Circuit's decision in Women's Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 210 (6th Cir. 1997) is instructive. At issue there was an Ohio statute regulating abortions and the Montgomery County prosecutor's argument that his presence was "unnecessary for the court to make a determination as to the Act's constitutionality." Rejecting that argument, the Sixth Circuit observed that "the prosecutors *could* charge plaintiff . . . who performs abortions in Montgomery County, with violating the Act." Id. (emphasis added). Moreover, the county prosecutor was "necessary in terms of injunctive relief" because, "[i]f the District Court found the Act unconstitutional, as it did, the prosecutor would not have been bound by the injunction if he were not a party." Id.; see also, Harbison v. Little, No. 3:06-CV-01206, 2007 WL 6887552, at *9 (M.D. Tenn. July 19, 2007) (citing Women's Prof'l Corp. and noting that "naming multiple parties in their official capacities is [not] superfluous" because "a plaintiff may need to name multiple parties so that they each may be bound by an injunction"). The District Attorney Generals will not be dismissed.

27

### 4. The County Clerks

Because of the ground the Court has already covered, resolution of the County Clerks' requests for dismissal on sovereign immunity grounds is relatively straight-forward. As already explained, it is entirely proper to sue a the county clerk when challenging the constitutionality of a statute pertaining to marriage licenses. Indeed, as Plaintiffs correctly observe, "the path to invalidating a statute restricting who may solemnize marriages is well trodden, and consistently runs through county clerks." (Doc. No. 223 at 12) (emphasis omitted).

Further, the County Clerks certainly have "some connection" to the Amendment. By law, they are required to follow the marriage statutes. If they do so and reject licenses for couples who are to be wed by Universal Life Ministers, then they have violated Plaintiffs' constitutional rights, or so Plaintiffs allege. If the County Clerks ignore the Amendment and issue licenses, then the marriage is not recognized as valid in Tennessee, which would again violate Plaintiffs' consitutional rights, or so they claim.

Contrary to the County Clerks' arguments, the recent decision of the Sixth Circuit in Ermold v. Davis, 936 F.3d 429, 433 (6th Cir. 2019) does not alter this conclusion. In fact, in a prior Order in this case, the Court rejected the same argument, noting that the Clerks "read Ermold too broadly," and writing:

> Ermold involved a Kentucky county clerk who refused to issue marriage licenses to same-sex couples. Noting that not all government officials work in a "jurisdictional silo" and that "some have hybrid duties in which they serve both state and local government," the Sixth Circuit found that the Rowan County Clerk "acted on Kentucky's behalf when issuing (and refusing to issue) marriage licenses," and, consequently, "sovereign immunity protects her . . . from an official-capacity suit." Ermold, [936 F.3d at 433-34]. At issue there was a suit for money damages. Here, in contrast, Plaintiffs are seeking injunctive relief, and sovereign immunity "does not apply if the lawsuit is filed against a state official for purely injunctive relief

28

enjoining the official from violating federal law." Ernst v. Rising, 427 F.3d 351, 358–59 (6th Cir. 2005) (en banc) (citing Ex parte Young, 209 U.S. 123, 155–56 (1908)).  In fact, "when state officials are sued solely for prospective injunctive relief, sovereign immunity does not apply even if the injunctive relief may affect the state treasury." Id. at 365 (citing Edelman v. Jordan, 415 U.S. 651, 667 (1974)).

(Doc. 109 at 2-3); see also, Virginia Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255 (2011) (The Ex parte Young doctrine "rests on the premise – less delicately called a 'fiction' – that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."); Price v. Medicaid Dir., 838 F.3d 739, 747 (6th Cir. 2016) (holding that enjoining a state official from a wrongful practice "is the kind of prospective injunctive relief that Ex parte Young permits"); Vann v. U.S. Dep't of Interior, 701 F.3d 927, 928 (D.C. Cir. 2012) ("Under Supreme Court precedent, [suing an appropriate state official is] the standard approach by which a party may obtain declaratory or injunctive relief with respect to a sovereign entity notwithstanding sovereign immunity.").  Accordingly, the County Clerks will not be dismissed from this action on sovereign immunity grounds.

## C.  Remaining Matters

### 1.  *Monell and Qualified Immunity*

Putnam County Clerk Nabors asserts that Plaintiffs' claims are barred by Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), while Hamilton County Clerk Knowles argues that he is entitled to qualified immunity.  Both arguments are inapplicable to the allegation in this case and fail for that reason alone.

In Monell, the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor[.]"  Id. at 691.  In other words, "under § 1983, local governments are responsible only for 'their own illegal acts.' . . . They are not vicariously liable under § 1983 for their

29

employees actions." <u>Connick v. Thompson</u>, 131 S.Ct. 1350, 1359 (2011) (quoting <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479 (1986)). Therefore, "a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." <u>D'Ambrosio v. Marino</u>, 747 F.3d 378, 386 (6th Cir. 2014) (citation omitted).

This case has noting to do with a municipality, a municipal policy, or allegedly rogue municipal employees. Rather, it is a case challenging a state law implemented by state official. <u>Monell</u> is simply inapposite. <u>See</u> <u>Barachkov v. 41B Dist. Court</u>, 311 F. App'x 863, 872 (6th Cir. 2009) ("<u>Monell</u>, which established the circumstances under which a municipality may be held vicariously liable as a person under § 1983 for injuries inflicted by its employees pursuant to a government policy or custom, is not relevant to whether a state official, sued in her official capacity, qualifies as a 'person' under § 1983."); <u>Estate of Young v. Martin</u>, 70 F. App'x 256, 260 (6th Cir. 2003) ("<u>Monell</u> was . . . concerned with whether local governments were subject to the same immunity from suit under § 1983 as states and state actors in their official capacities.").

Hamilton County Clerk Knowles' assertion of qualified immunity is equally misplaced. "An official's qualified immunity does not preclude injunctive or declaratory relief." <u>Faith Baptist Church v. Waterford Twp.</u>, 522 F. App'x 322, 328 (6th Cir. 2013). In other words, "immunity only precludes claims for monetary damages against officials in their individual capacities, and not claims for injunctive or declaratory relief." <u>Collyer v. Darling</u>, 98 F.3d 211, 222 (6th Cir. 1996); <u>see also</u> <u>Smith v. Leis</u>, 407 F. App'x 918, 930 (6th Cir. 2011) ("[A] court could award both declaratory and injunctive relief in an action against a defendant protected by qualified immunity."). Here, Plaintiffs

30

seek injunctive and declaratory relief against the County Clerks and neither <u>Monell</u> or qualified immunity is a bar to such relief.

### 2. *Rules 12(b)(6) and 12(b)(1)*

Finally, several of the County Clerks move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of a justiciable case or controversy and/or under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In doing so, the County Clerks merely recast arguments they have previously made, and the Court has already discussed the justiciability and ripeness of Plaintiffs' claims. As for failure to state a claim, "Section 1983 makes 'liable' '[e]very person' who 'under color of' state law 'subjects, or causes to be subjected,' another person 'to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]'" <u>Rudd v. City of Norton Shores</u>, 977 F.3d 503, 512 (6th Cir. 2020) (quoting 42 U.S.C. § 1983). Plaintiffs allege that they have been deprived of the constitutional rights to freedom of religion and association, due process, and equal protection because of the Amendment's preferential treatment of other religions. They also allege that County Clerks either deny marriage licenses to couples being married by ULC Monastery ministers, or they issue legally invalid licenses. Both assertions are sufficient to state a Section 1983 claim.

### III. <u>Conclusion</u>

On the basis of the foregoing, the Motions to Dismiss filed by Defendants (Doc. Nos. 206, 208, 210, 212, 215) will be granted in part and denied in part. The Motions will be granted to the extent that they seek dismissal of (1) Governor Bill Lee as a Defendant; and (2) Gale Plumm and Timeaka Farris as Plaintiffs in this case, and all claims for and against those individual will be dismissed with prejudice. In all other respects, the Motions will be denied.

31

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Case 2:19-cv-00049   Document 236   Filed 12/22/20   Page 32 of 32 PageID #: 3246